Susan E. CULLEN, Mary Beth Phelps and Monica Davis, Individually and as Representatives of a Class of Students of Ultrasound Diagnostic Schools, Plaintiffs,

v.

WHITMAN MEDICAL CORP.,
et al., Defendants.

No. 98 CV–4076.

United States District Court,
E.D. Pennsylvania.

July 21, 1999.

Howard Langer, Sandals, Langer & Taylor, LLP, Ruben Honik, Greetzer & Honik, Darryl J. May, David S. Fryman, Ballard Sphar, Andrews & Ingersoll, Philadelphia, PA, for plaintiffs.

Peter W. Homer, Green Homer Cope & Bonner, Miami, FL, Matthew A. White, Jerome J. Shestack, Wolf Block Schorr & Solis–Cohen, Philadelphia, PA, for defendants.

## *MEMORANDUM*

ANITA B. BRODY, District Judge.

Three named plaintiffs bring this action on behalf of a proposed class against a vocational school and its parent company for fraudulently misrepresenting to the students the education they would receive. Jurisdiction is predicated on the Racketeer Influenced and Corrupt Organization Act ("RICO"), 18 U.S.C. § 1964 and 28 U.S.C. § 1331. Plaintiffs also assert pendent causes of action for violations of state consumer protection statutes, and for breach of contract and fraud. The plaintiffs move for certification of the class pursuant to Federal Rule of Civil Procedure 23. For the following reasons, I will grant plaintiffs' motion and certify the class, but only under the "complete sham" theory.

## I. Factual Background

For the purposes of class certification, the court is bound to take the substantive allegations of the complaint as true. *Blackie v. Barrack*, 524 F.2d 891, 901 n. 17 (9th Cir.1975) *cert. denied*, 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976). The facts as set forth are taken from the plaintiffs' amended class action complaint ("Pl. Compl."). The plaintiffs are three former students of the Ultrasound Diagnostic School ("UDS"), a vocational school operated by Ultrasound Technical Services, Inc., which is a subsidiary of the Whitman Educational Group, a publicly traded corporation. UDS purported to provide an education in the field of diagnostic medical sonography. Pl. Compl. at 6. From August 1994 to August 1998, UDS operated fifteen schools in eight states. Plaintiffs claim that all the schools offered the same curriculum, used the same course guides and were overseen by the same individuals. In their amended complaint, plaintiffs allege that defendants employed a fraudulent scheme of misrepresenting the nature of the ultrasound program, and failed to provide the education represented. Pl. Compl. at 6–9. Plaintiffs also claim that the defendants misrepresented the graduation and placement rates of students to the Accrediting Bureau of Health Education Schools ("ABHES"), the institutional accrediting body, in order to qualify for federally guaranteed loans. *Id.* at 6. In plaintiffs' reply to defendants' response to plaintiffs' motion for class certification ("Pl. Reply"), they allege that defendants represented that they were providing a program that would prepare students for careers as ultrasound sonographers. Plaintiffs claim, however that instead, defendants' operation was a "complete sham," and did not provide even a minimal education. Pl. Reply at 8.

Plaintiffs claim that UDS graduates were not eligible to get jobs as sonographers because, although the school was institutionally accredited by ABHES, it was not *program* accredited by the Commission on Accreditation of Allied Health Education Programs ("CAAHEP"). Pl. Compl. at 9. Although

program accreditation is voluntary, plaintiffs claim that students graduating from schools without program accreditation were not eligible to sit for the registration exam of the American Registry of Diagnostic Medical Sonographers ("ARDMS") upon graduation. *Id.* at 7. Plaintiffs state that defendants' literature gives the impression that attending and graduating from UDS somehow relates to qualification for the registration exam. Plaintiffs argue, however, that a student with no prior medical education would require virtually the same four years of actual clinical experience as a sonographer before qualifying to sit for the exam as that person would have required if he or she had never attended UDS. *Id.* The registration exam is voluntary, but plaintiffs allege that it has become a prerequisite for the vast majority of sonographer jobs.

While UDS was not program accredited by CAAHEP, plaintiffs concede that defendants were *institutionally* accredited by the Accrediting Bureau of Health Education Schools ("ABHES"). ABHES requires that schools maintain certain graduation and placement rates in order to qualify for its accreditation. Plaintiffs contend that defendants misrepresented the graduation and placement rates to ABHES in order to keep their accreditation. Pl. Compl. at 6. In their motion for class certification and supporting brief ("Pl. Mot."), plaintiffs claim that while the UDS graduation rate was actually between fifty and sixty percent in all locations, defendants inflated those numbers to ensure that UDS was able to qualify potential students for federal loans. Pl. Mot. at 5.

In addition, plaintiffs claim that defendants had no meaningful admissions criteria for students and that they hired unqualified administrative personnel who turned over annually. The UDS program also included clinical externships where students would learn to perform sonograms on patients. Plaintiffs claim that the externship program was overcrowded and unsupervised, and that the equipment was substandard and broken. Pl. Compl. at 7. Finally, plaintiffs contend that UDS graduated students without proper assurance of their abilities as sonographers, and that the graduates were unable to finds

jobs. *Id.* at 9. In sum, plaintiffs argue that, while UDS held itself out as a school to prepare students for entry level sonography positions, the school was a sham that provided students with little or no education.

## II. DISCUSSION

In deciding whether to certify a class, a court may not consider "whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits." *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 178, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974) (quoting *Miller v. Mackey Internat'l.,* 452 F.2d 424, 427 (5th Cir.1971)). Rather, the court must decide whether the plaintiffs meet their burden under Federal Rule of Civil Procedure 23, which entails satisfying each of the four prerequisites set forth in Rule 23(a), and at least one of the requirements of 23(b). *Id.*

### A. Rule 23(a)

The four elements of Rule 23(a) are:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a). These four elements will be referred to as "numerosity," "commonality," "typicality," and "adequacy of representation" respectively. *Hassine v. Jeffes,* 846 F.2d 169, 176 n. 4 (3d Cir.1988). The following analysis under Rule 23(a) applies to all counts of plaintiffs' complaint: RICO, consumer protection, breach of contract and fraud.

#### 1. Numerosity

To satisfy the numerosity requirement, a class plaintiff must demonstrate that the class is so numerous that joinder of all members is impracticable. Fed.R.Civ.P. 23(a)(1). Plaintiffs' complaint states that the putative class is composed of all people who incurred financial obligations from August 1,

1994 through August 1, 1998 as a result of receiving federally guaranteed student loans or other federally financed aid for purposes of their enrollment in UDS. The complaint alleges that the class includes hundreds of people, Pl. Compl. at 4, but the motion for class certification states that the class could number between six and eight thousand. Pl. Mot. at 11. Defendants do not dispute that plaintiffs satisfy the numerosity requirement.

### 2. Commonality

■■ The commonality requirement will be satisfied if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class. *Baby Neal v. Casey,* 43 F.3d 48, 56 (3d Cir.1994). A single common issue may satisfy this requirement, and thus, it is easily met. *Id.* (citing Herbert Newberg & Alba Conte, Newberg on Class Actions § 3.10 at 3–50 (3d ed.1992)). Defendants do not dispute that plaintiffs satisfy the commonality requirement.

### 3. Typicality

■ The third element of Rule 23(a) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R.Civ.P. 23(a)(3). The typicality criterion is intended to preclude certification in cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees. *Baby Neal,* 43 F.3d at 57. The inquiry is whether "the named plaintiff's individual circumstances are markedly different or ... the legal theory upon which the claims are based differs from that upon which the claims of other class members will perforce be based." *Eisenberg v. Gagnon,* 766 F.2d 770, 786 (3d Cir.1985) (quoting *Weiss v. York Hospital,* 745 F.2d 786, 809 n. 36 (3d Cir. 1984)).

Commentators have noted that cases challenging the same unlawful conduct that affects both the named plaintiffs and the rest of the putative class usually satisfies the typicality requirement, despite disparities in the individual factual scenarios. *Baby Neal,* 43 F.3d at 58 (citing Newberg, *supra,* § 3.13). "[F]actual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory." *Hoxworth v. Blinder, Robinson & Co.,* 980 F.2d 912, 923 (3d Cir.1992) (citations omitted). The Third Circuit has noted that even significant factual differences will not preclude a finding of typicality where there is a strong similarity of legal theories. *Baby Neal,* 43 F.3d at 58.

■ Defendants claim that plaintiffs do not satisfy the typicality requirement for two reasons: first, because the named plaintiffs' factual and legal theories are different from one another and from the rest of the class, and second, because the named plaintiffs are subject to unique defenses. Defendants' Response at 28–29 ("Def. Resp."). Defendants argue that the named plaintiffs each tell different stories about the representations made to them that induced them to enroll in the program and that they each report different experiences at UDS. *Id.* at 29. Defendants also claim that one of the named plaintiff's claims is time-barred by the statute of limitations, rendering her an atypical representative. Def. Resp. at 31–32.

Although each named plaintiff might come before this court with significant factual distinctions, all plaintiffs base their claims on the theory that they were defrauded by the defendants. There is no divergence of legal theory. The gravamen of plaintiffs' claim is the misrepresentation of the education provided, and factual distinctions among the underlying claims will not prevent plaintiffs from satisfying the typicality requirement. As for the issue of unique defenses, whether one of the named plaintiff's claims is time-barred is a disputed issue inappropriate for adjudication at the class certification stage. *Gruber v. Price Waterhouse,* 117 F.R.D. 75, 80 (E.D.Pa.1987); *Rishcoff v. Commodity Fluctuations Sys. Inc.,* 111 F.R.D. 381, 382 (E.D.Pa.1986). While the statute of limitations defense may ultimately affect an individual's right to recover, it does not affect the presentation of the liability issues for the plaintiffs' class. The question for a class certification determination is not whether plaintiff has stated a cause of action on the

merits, but whether the plaintiffs have met the requirements of Rule 23. Accordingly, I find that plaintiffs meet the typicality requirement.

### 4. Adequacy of Representation

██ To determine whether the named plaintiffs adequately represent the interests of the class, the court examines two factors: (1) whether the named plaintiffs' counsel is competent to represent the class; and (2) whether there exist any conflicts of interest between the representatives and the rest of the class. *In re The Prudential Ins. Co. of Am. Sales Practices Litig.*, 148 F.3d 283, 312 (3d Cir.1998) (citations omitted).

██ As to the first prong, I find, and defendants do not dispute, that plaintiffs' counsel is able to represent the putative class competently. Defendants do argue, however, that the named plaintiffs and the putative class are divided into the following three subgroups whose interests are adverse: (1) former UDS students who could not find employment; (2) former UDS students who did find employment; and (3) and current UDS students. Def. Resp. at 35. Defendants claim that former, dissatisfied students who want to label the UDS program as a sham are at odds with those students who are currently enrolled at UDS. Def. Resp. at 36. If the dissatisfied students prevail in characterizing the school as a sham, defendants argue, the school's blackened name will compromise current UDS students' ability to get jobs. *Id.*

The Seventh Circuit rejected an almost identical argument in *Rosario v. Livaditis*, 963 F.2d 1013 (7th Cir.1992). In *Rosario*, former students from two beauty colleges sued the schools, alleging that they were "sham schools" because the schools provided little or no education. The claims were grounded in RICO and the district court certified the students as a class. On appeal, the defendants argued that the plaintiffs were antagonistic to the class members who were successful graduates because those graduates were stigmatized by the class lawsuit. *Id.* at 1018. The Court of Appeal for the Seventh Circuit stated that there was no substantial basis for the defendants' theory.

*Id.* The court stated that attacking a school does not necessarily affect the careers of graduates of that school. *Id.* at 1018–19. Furthermore, the court refused to preclude certification of a class if the basis of the named plaintiffs' conflict with the class is speculative. *Id.* at 1019.

I find that the named plaintiffs' potential conflicts with different types of former and current students are speculative indeed. First, simply because a former student found employment after graduation does not mean that student was satisfied with UDS. On the contrary, many of those students may have found jobs despite their education and would welcome a lawsuit against the school. As for the current students of UDS, if the school is in fact a complete sham, it is hard to imagine how exposing the school as a fraud would be anything but beneficial to those students who would be able to cut their losses and possibly recover damages. I find that the plaintiffs meet the fourth and final requirement of Rule 23(a).

### B. Rule 23(b)

Once the four requirements of Rule 23(a) are met, the named plaintiffs must satisfy any one of the subsections of Rule 23(b). In this case, the plaintiffs claim that they meet the requirements of two subsections: Rule 23(b)(3) and Rule 23(b)(1)(B).

#### 1. Rule 23(b)(3)

To certify a class under Rule 23(b)(3) the court must find that:

> [t]he questions of law or fact common to the members of the class predominate over any question affecting only individual members, and that a class action is superior to the other available methods for the fair and efficient adjudication of the controversy.

Fed.R.Civ.P. 23(b)(3). The two aspects of Rule 23(b)(3) are predominance of common questions and superiority of the class. I will discuss each in turn.

#### a. Predominance

For purposes of analyzing whether common questions predominate, it is necessary to

evaluate whether proving the elements of the plaintiffs' claims can be done through common questions or whether the proof will be overwhelmed with individual issues. The principal contention in this case is that the defendants defrauded plaintiffs through misrepresenting the nature and quality of the school. I find that this alleged systematic course of conduct that misled the class members can be shown through common evidence. The more challenging question is whether plaintiffs can prove that defendants' alleged fraud caused each plaintiff's injury without having the litigation devolve into individual mini-trials.

Plaintiffs have articulated three different theories of liability, the first two of which were raised in plaintiffs' amended class certification motion. Pl. Mot. at 5–7. The first theory plaintiffs assert is that defendants made misrepresentations about the nature and quality of the program directly to the students that caused them to attend the school. Second, plaintiffs argue that the defendants made misrepresentations to ABHES (the institutional accrediting organization) in order to ensure accreditation. Plaintiffs claim that the ABHES accreditation was related to the school's ability to qualify for federal loans. This indirect fraud on the government, plaintiffs claim, resulted in loans being issued and students incurring debt to attend the school. Finally, in the plaintiffs' reply memorandum and in oral argument, plaintiffs recharacterized their claim as follows: "[p]laintiffs' basic claim is that defendants represented that they were providing a program that would prepare a student for a career as an ultrasound sonographer, but instead operated as a complete sham without even providing a minimal ultrasound education." Pl. Reply at 8. I will treat the "complete sham" theory as a third theory of liability.

### Theory 1: Direct Misrepresentation

The plaintiffs' first theory is that defendants made misrepresentations about the school directly to the students through their literature and during interviews. In addressing this theory, plaintiffs and defendants both have devoted much energy to arguing whether or not the proximate cause requirement of RICO obligates the plaintiff to demonstrate detrimental reliance. I will briefly explain RICO's proximate cause requirement and why I need not determine whether plaintiffs must prove detrimental reliance in proving causation.

Plaintiffs claim that defendants conducted an enterprise through a pattern of racketeering activity, thereby causing injury to plaintiffs. 18 U.S.C. § 1962(c). The RICO statute lists a number of acts that can constitute the "predicate acts" that compose a pattern of racketeering activity. *See* 18 U.S.C. § 1961(1). In this case, plaintiffs allege the predicate acts of mail and wire fraud. 18 U.S.C. §§ 1341, 1343. The predicate acts of mail and wire fraud themselves do not contain a reliance requirement. *Id.; see also Prudential Ins. Co. v. Gypsum Co.,* 828 F.Supp. 287, 295 (D.N.J.1993). Thus, any detrimental reliance requirement would have to come from the language of RICO itself and not from the predicate acts of mail or wire fraud. *Id.*

RICO's causation requirement derives from § 1964(c), which provides that a plaintiff has standing to bring a RICO claim when he or she has been injured in his or her business or property "by reason of" the defendants' racketeering activity. *Prudential Ins.,* 828 F.Supp. at 293. The United States Supreme Court has interpreted the "by reason of" language of § 1964 to require that the RICO violation be the proximate or legal cause of plaintiff's injury. *Holmes v. Securities Investor Protection Corp.,* 503 U.S. 258, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992). The RICO pattern is the proximate cause of a plaintiff's injury if it is a substantial factor in the sequence of responsible causation, and if the injury is reasonably foreseeable or anticipated as a natural consequence. *Brittingham v. Mobil Corp.,* 943 F.2d 297, 304 (3d Cir.1991). Through the lens of this proximate cause requirement, I must consider whether plaintiffs will be able to present proof of causation without individual issues predominating.

The question that evoked such debate between the parties in this case is whether RICO's proximate cause require-

ment includes a showing of detrimental reliance where the RICO violation is predicated on mail or wire fraud. Indeed, there is some uncertainty in this circuit as to whether a RICO plaintiff must show reliance to state a claim.[1] I find, however, that, in this case, contrasting reliance and causation is simply noting a distinction without a difference. Presumably, the parties focused on the issue of reliance because they surmised that if I found that plaintiffs had to prove individual reliance on the misrepresentations, then I would find that individual issues predominate. As a practical matter, however, where the RICO predicate act is mail or wire fraud, proof of proximate cause is fraught with the same evidentiary trappings as proof of reliance. Even without a reliance requirement, plaintiffs still must show the defendants' alleged misrepresentations in their literature and/or their student interviews proximately caused them to attend the school and be damaged. Just as with the endeavor to prove reliance, proof of causation would be complex and highly individualized in nature. Each student would have to show that it was the misrepresentations that caused her to attend the school, and not, for example, the fact that she could not get admitted to any other ultrasound program or that she could not afford any other school. In addition, the fraudulent nature of some of the alleged statements, such as students' ability to sit for the ARDMS examination after graduating from UDS, turn on the qualifications and experiences of each individual student. On the theory of direct misrepresentation to the students, I find that individual issues of cau-

sation will predominate in the RICO claim and make this case ill suited for class litigation. *See Torres v. CareerCom Corp.*, 1992 WL 245923, at *4 (E.D.Pa.1992).

In addition to their RICO claim, plaintiffs allege violations of state consumer fraud statutes, common law fraud and breach of contract. The analysis under RICO applies with equal force to the consumer fraud and common law fraud claim because with all three claims, a plaintiff must prove that the fraud caused the injury. Even though most common law fraud and consumer protection statutes also expressly require that the plaintiff show detrimental reliance, simply proving that the fraud caused the plaintiffs to attend UDS would be a case by case labor. Individual issues would predominate.

As for the breach of contract claim, although presumably the UDS contract with students is standard, the breach of contract claim invites an inquiry into exactly with which terms UDS complied or did not comply with respect to each claimant. Accordingly, I deny certification for these pendent state law claims under the theory of direct misrepresentation to the students.

### Theory 2: Fraud on the Government

The plaintiffs' second theory is that the defendants fraudulently misrepresented certain statistics to ABHES, the institutional accrediting body, in order to attain the accreditation necessary to qualify UDS for federal loans. Plaintiffs claim that, in turn, the students relied on those loans so that they could attend UDS.[2]

---

1. Courts within this Circuit have generally held that in order to state a RICO claim, the plaintiff must show reliance on the underlying mail or wire fraud. *See, e.g., Torres v. CareerCom Corp.*, 1992 WL 245923 (E.D.Pa.1992); *Rosenstein v. CPC Int'l. Inc.*, 1991 WL 1783 (E.D.Pa.1991); *Strain v. Nutri/System, Inc.*, 1990 WL 209325 (E.D.Pa.1990); *but see Prudential Ins.*, 828 F.Supp. at 294 (holding no reliance requirement under RICO). Plaintiffs interpret a footnote in *Tabas v. Tabas*, 47 F.3d 1280, 1294 n. 18 (3d Cir.1995), as having eliminated the detrimental reliance requirement in RICO actions in this circuit. That footnote states: "Defendants' assertion that the mailings involved must themselves be relied upon by the victim of the fraud in order for a RICO claim to be established in inaccurate." *Id.* For the reasons stated above, it is not necessary for me to address whether that

footnote eliminated the reliance requirement altogether, or whether it was simply intended to clarify that the reliance need not be on the predicate mailings themselves.

2. With respect to this second theory of fraud on the government, plaintiffs attempt to draw parallels to my opinion in *Rodriguez v. McKinney*, 156 F.R.D. 112 (E.D.Pa.1994). In *Rodriguez*, I certified a class on the theory that the defendant school systematically misrepresented the students' ability to benefit to the government, and that in reliance on those representations, the government authorized loans to students. *Rodriguez*, 156 F.R.D. at 116.

The facts in *Rodriguez*, however, diverged dramatically from the facts in this case. First, in *Rodriguez*, the cause and effect relationship be-

Proof of the fraud on the government theory, however, will still be dominated by individual issues. First, the causal links between defendants' alleged misrepresentations and the government's disbursement of loans are attenuated and weak, and will necessitate individualized proof. Each of the UDS schools must apply separately for accreditation, and must reapply to keep that accreditation current. Thus, in order to prove the necessary causal connections, each student will have to show that for the given year he or she applied for loans to attend a particular UDS school, the defendants made misrepresentations concerning that particular UDS school to ABHES, that those misrepresentations were material to ABHES's decision to accredit the school, and that the accreditation was the proximate cause of the federal government issuing loans. The fact finder would have to make causation determinations for each of the fifteen school locations for each of the four years of the alleged class period; that is to say, sixty different causation determinations.

Moreover, plaintiffs will have to prove that each class member relied on the government loans to attend UDS. Although it is reasonable to presume that for those students who applied for and accepted federal loans, those loans were the preferred way to finance their education, it is not reasonable to presume that the availability of the loans caused the students to attend UDS. The fact finder would have to make an individual determination for each plaintiff as to whether he or she would have attended UDS absent receiving the loans. I find that individual issues relating to causation would predominate over common ones and I decline to certify the class under this theory of the case.

Plaintiffs' consumer protection and common law fraud claims meet the same fate as the RICO claim under this theory. Because I decline to presume the students' reliance on the federal loans, individual issues would certainly predominate plaintiffs' proof of either of these claims. Moreover, plaintiffs' breach of contract claim is an inappropriate legal claim for this theory of liability and cannot be sustained. Thus, I decline to certify the state claims under plaintiffs' second theory of liability.

### Theory 3: Complete Sham

■ The plaintiffs' third theory of liability is the "complete sham" theory. The heart of this theory is that UDS failed to meet even the most minimal and basic standards for an ultrasound program. Pl. Reply at 2. Plaintiffs claim that the UDS administrators were unqualified, the teachers were unqualified, the school lacked meaningful admissions requirements, students were permitted to graduate without proving proficiency, externships were unsupervised, and training was inadequate. By holding themselves out as an ultrasound vocational school, plaintiffs argue, defendants were committing fraud. And so, the argument goes, any student who believed that UDS was an ultrasound vocational school, and paid tuition to attend that school, was damaged.

Defendants argue that the nature of the fraud claims preclude predominance of common issues. Defendants contend that, as with plaintiffs' first theory, each plaintiff will have to show what misrepresentations caused them to go to the school in order to make out a claim. If, however, I accept for purposes of a class ruling, plaintiffs' claim that UDS is a complete sham, then it does not matter upon which representations each plaintiff relied. The mere fact that a plaintiff incurred debt to attend a school that was valueless is proof that the plaintiffs were taken in by the misrepresentation that the school was a viable vocational program. The students' very choice to go to the school is sufficient evi-

tween the defendants' alleged misrepresentations and the government's decision to distribute loans to the students was direct, making proof of causation through common evidence possible. Second, and more importantly, in *Rodriguez*, the school itself allegedly took low-income people, with low test scores, no high school diploma and no G.E.D. and misrepresented to those students and to the government that each one had an

ability to benefit from attending the school. The school allegedly lured both the government and the students into thinking these students could benefit. I found that the students' reliance on those misrepresentations could be presumed, given those egregious facts. There are no such allegations in this case that would warrant such a presumption.

dence that they were fraudulently induced to enroll.

In a similar case, *Rosario v. Livaditis,* 963 F.2d 1013 (7th Cir.1992), the Court of Appeals for the Seventh Circuit upheld the certification of a class of former beauty college students who sued the college for violations of RICO and the state fraud statute. Plaintiffs alleged that the schools were "sham schools." *Id.* at 1013. Although *Rosario* featured an extreme factual scenario, including allegations of vermin in the classrooms, those factual distinctions are irrelevant for purposes of Rule 23 analysis. The shocking facts in *Rosario* go to the plaintiffs' ultimate likelihood of success on the merits, but the merits are not at issue for purposes of the class certification motion. Whether the plaintiffs in this case can prove that UDS was so egregiously deficient that simply by holding UDS out as a vocational ultrasound school defendants were committing fraud is not for me to decide now. I find that under the sham theory, plaintiffs' proof will be focused on the defendants' conduct; plaintiffs' case will revolve around evidence that the school did not meet the most basic standards of an educational program. It need not involve time consuming proof of individual causation or reliance. If the plaintiffs can prove that UDS was a complete sham, then a fact finder can infer from the evidence that anyone who paid tuition and attended the school suffered damage. Accordingly, I will certify under RICO for the complete sham theory of liability.

The state law claims for violations of the consumer protection statutes and for common law fraud do require that plaintiffs prove reliance on the fraud. However, due to the defendant-focused way the proof of the sham theory will unfold, even state law claims that indisputably require a showing of reliance will not defeat certification. If plaintiffs can prove that the school was a complete sham, then anyone that paid money to go there must have relied to his or her detriment on the misrepresentation that the school was legitimate.

Similarly, the breach of contract claim can go forward under the sham theory. If the plaintiffs prove that UDS was a sham school, then plaintiff may be able to prove breach of contract without delving into each student's experience with the school. Accordingly, I find that common issues predominate under plaintiffs' third theory of liability with respect to the state law claims.

### b. Superiority

The second requirement of Rule 23(b)(3) is that the class action is "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R.Civ.P. 23(b)(3). In making such a find, courts must consider: (1) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (3) the desirability of concentrating the litigation of the claims in the particular forum; and (4) the difficulties likely to be encountered in the management of a class action. Fed.R.Civ.P. 23(b)(3)(A)–(D).

I find that the class action is superior to other methods of litigation for adjudicating this case. First, it would be financially unfeasible for many of the class members to bring this action individually. Second, the only individual cases pending are before me. Those cases have been stayed and can be folded into the class. Third, the Eastern District of Pennsylvania is the appropriate forum to bring this action considering the Philadelphia school is in this district and the three named plaintiffs reside here. Finally, I do not anticipate insurmountable manageability problems litigating this case as a class action. By certifying the class on the sham theory only, plaintiffs can prevail if they prove that the school did not meet even the most minimal requirements of a vocational program. The proof, therefore, will not center around the plaintiffs' individual experiences, but rather on the defendants' program. It is more efficient and economical to try the issue of whether UDS is a sham school only once, rather than in a succession of suits. Furthermore, I find that choice of law issues will not preclude class treatment. There are nine states involved in certifying this class, and the variations among the state

law claims from state to state are not dramatic enough to derail certification. *See Hanrahan v. Britt,* 174 F.R.D. 356 (E.D.Pa. 1997) (finding that choice of law issues would not prevent certification of class alleging RICO violation with pendent state law claims for common-law fraud and negligent misrepresentation).

### 2. Rule 23(b)(1)(B)

Plaintiffs also claim that they can be certified as a class under Rule 23(b)(1)(B). Rule 23(b)(1)(B) applies where "the prosecution of separate actions by or against individual members of the class would create a risk of ... adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interest." Fed. R.Civ.P. 23(b)(1)(B). The advisory committee notes state that subsection (b)(1)(B) applies to "situations where the judgment in a nonclass action by or against an individual member of the class, while not technically concluding the other members, might do so as a practical matter." Fed.R.Civ.P. 23, (advisory committee notes to 1966 amendments).

The most common use of subsection (b)(1)(B) class actions is in "limited fund" cases, where claims are aggregated against a fund insufficient to satisfy all claims. *Ortiz v. Fibreboard Corp.,* —— U.S. ——, ——, 119 S.Ct. 2295, 2308–10, 144 L.Ed.2d 715 (1999) (citations omitted). "Classic illustrations include claimants to trust assets, a bank account, insurance proceeds, company assets in a liquidation sale, proceeds of a ship sale in a maritime accident suit, and others." Newberg, *supra,* § 4.09 at 33. In the limited fund class action, absent class members do not receive notice and do not have the ability to opt-out of the class. Newberg, *supra,* § 4.01, at 4–6.

■ In order for a plaintiff to satisfy the limited fund rationale for a class action, the plaintiff must establish the existence of three characteristics: (1) the totals of the aggregated liquidated claims must exceed the fund available for satisfying them; (2) the whole of the inadequate fund must be devoted to the overwhelming claims; and (3) the claimants identified by a common theory of recovery must be treated equitably in the distribution of the fund. *Ortiz,* 119 S.Ct. at 2311–12.

In establishing the first required characteristic, the parties must present substantive evidence showing that the defendants' assets would be insufficient to meet plaintiffs' claims. *In re Orthopedic Bone Screw Prods. Liab. Litig.,* 176 F.R.D. 158, 176 (E.D.Pa. 1997) (citing *In re School Asbestos Litig.,* 789 F.2d 996, 999 (3d Cir.1986)). The plaintiffs must offer evidence that the defendants will likely be rendered insolvent should plaintiffs prevail in their claims, and that there is a substantial probability of plaintiffs' success in the suit. *Suffolk v. Long Island Lighting Co.,* 710 F.Supp. 1407, 1418 (E.D.N.Y.1989) (citing *In re "Agent Orange" Prod. Liab. Litig.,* 506 F.Supp. 762, 789–90 (E.D.N.Y. 1980)).

Plaintiffs did not make their "limited fund" claim with much force, submitting little evidence. In their amended motion for class certification, plaintiffs estimated that a class of four thousand claimants with damages limited to recision, would result in $40 million in damages that would be trebled under RICO. Pl. Mot. at 19. Plaintiffs further submitted that the market capitalization of Whitman is $51 million (see Pl. Mot. at Exhibit A) and that its total assets were just over $53 million dollars (see Pl. Mot. at Exhibit B). Plaintiffs did not, however, request a hearing on defendants' ability to cover potential claims to flesh out defendants' financial status, nor did they address the possibility of other fund sources for the defendants, such as insurance coverage. In short, I find that there is insufficient evidence for me to make a finding on whether there is a limited fund.

■ Even if there were a limited fund, I decline to certify the class under 23(b)(1)(B) because the putative class members do not include all potential claimants. *See In re School Asbestos Litig.,* 789 F.2d 996, 1005 (3d Cir.1986) (reversing the district court's certification under 23(b)(1)(B) because the class as defined was under-inclusive). "Since the purpose of a 23(b)(1)(B) class is to avoid a judgment that 'while not technically conclud-

ing the other members, might do so as a practical matter,' ... all persons with claims upon the 'limited fund' should be included in the 23(b)(1)(B) class." *Id.* at 1006 (citing Fed.R.Civ.P. 23(b)(1)(B), advisory committee notes).

The amended motion for class certification defines the class as "[a]ll persons who incurred financial obligations at any time during the period August 1, 1994 through August 1, 1998 as a result of receiving federally guaranteed student loans or other federally financed aid as a result of their enrollment in the UDS Diagnostic Medical Ultrasound Program." Pl. Mot. at 1. Plaintiffs have alleged theories of liability, however, that implicate potential claimants beyond those in the putative class. If the school were proven to be a sham, potential claimants would not be limited to individuals who incurred a debt to the federal government. Any person who paid tuition to UDS, from whatever source, federal or private, would be a potential claimant. Rule 23(b)(1)(B) exists to protect potential claimants and to provide equality of treatment. *Id.* Certification of the putative class as a limited fund in this case will not accomplish the objective of protecting all potential claimants. Accordingly, I deny certification under Rule 23(b)(1)(B).

## III. CONCLUSION

For the reasons stated above, I grant plaintiffs' motion for class certification. The class proposed by plaintiffs in their amended motion for class certification is certified, and plaintiffs may proceed under the sham theory.

An appropriate order follows.

### *ORDER*

**AND NOW,** this day of July, 1999, I **ORDER** that plaintiffs' amended motion for class certification (docket entry # 14) is **GRANTED** pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure and may proceed on the sham theory only, consistent with this memorandum.

The plaintiff class consists of all persons who incurred financial obligations at any time during the period August 1, 1994 through August 1, 1998 as a result of receiving federally guaranteed student loans or other federally financed aid as a result of their enrollment in the UDS Diagnostic Medical Ultrasound Program.