**Eddie LESTER, et al., Plaintiffs,**

v.

**Gene P. PERCUDANI, et al., Defendants.**

**No. CIV.A.3:01–CV–1182.**

United States District Court,
M.D. Pennsylvania.

Sept. 15, 2003.

Arthur R. Miller, Harvard Law School, Cambridge, MA, Brad N. Friedman, Melvyn I. Weiss, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, Christopher A. Seeger, David R. Buchanan, Diogenes P. Kekatos, James A. O'Brien, Seth A. Katz, Stephen A. Weiss, Seeger Weiss LLP, New York City, David Banks, Banks & Banks, Lafayette Hill, PA, David M. Cedar, Samuel Merovitz, Merovitz & Cedar, LLP, Philadelphia, PA, Mark C. Walsh, Blasi & Walsh, Scranton, PA, for Plaintiffs.

Ernest D. Preate, Jr., Law Offices of Ernest D. Preate, Jr., Scranton, PA, Marshall E. Anders, Anders & Masington, L.L.C., Stroudsburg, PA, Daniel T. Brier, Myers, Brier & Kelly, LLP, Scranton, PA, John A. Guernsey, Conrad, O'Brien, Gellman & Rohn, P.C., Philadelphia, PA, LeAnn Pedersen Pope, Burke, Warren, MacKay, & Serritella, P.C., Chicago, IL, Scott Porter, Englewood Cliffs, NJ, Irwin R. Kramer, James M. Connolly, Kramer & Connolly, Owings Mills, MD, Jay B. Harris, Lee Applebaum, Phinorice J. Boldin, Fineman & Bach, P.C., Philadelphia, PA, for Defendants.

### *MEMORANDUM*

CONNER, District Judge.

In this case, named plaintiffs, Eddie and Sharon Lester, Gilbert and Madeline Vazquez, Arthur Lucky and Angela Romano–Lucky, and Roy and Yadrisia Lamberty, seek to represent "all persons ... who purchased a new construction house ... through the 'Why–Rent' program," operated by named defendants, Gene Percudani ("Percudani"), Chapel Creek Homes, Inc. ("Chapel Homes"), Raintree Homes, Inc. ("Raintree"), Dominick P. Stranieri ("Stranieri"), Chapel Creek Mortgage Banker, Inc. ("Chapel Mortgage"), William Spaner ("Spaner"), and Chase Manhattan Mortgage Corp. ("Chase"). (Doc. 1 ¶ 1). According to plaintiffs, defendants lured customers into the Why–Rent program by advertisements of rent coverage and low monthly mortgage payments, which later proved unavailable, and enabled them to purchase consistently overpriced homes beyond their economic means by manipulating monthly tax and mortgage estimates and credit materials. Following their purchase, tax reassessments resulted in substantial in-

creases in mortgage payments, often causing defaults and foreclosures. Plaintiffs seek damages on behalf of the proposed class under the federal Racketeering Influenced and Corrupt Organizations ("RICO") statute, 18 U.S.C. § 1964(c), and the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), PA. STAT. ANN. tit. 73, § 201–9.2(a). (Doc. 1 ¶ 1).

Presently before the court is plaintiffs' motion for class certification (Doc. 39) and defendants' motion to strike class action allegations (Doc. 10). The motions have been briefed extensively by all parties and are now ripe for disposition.

## I. *Factual Background* [1]

Beginning in 1994, Percudani began running in the New York City metropolitan area radio and television advertisements for the "Why–Rent" program. (Doc. 1 ¶ 22). These advertisements offered homes in the Pocono region of Pennsylvania, an area within driving distance of New York City, for "$1,000 down and monthly payments of $685." (Doc. 1 ¶ 23). The campaign's slogan was "WHY–RENT When You Can Own Your Own Home For $1,000 Down and What You Pay in Rent?" (Doc. 1 ¶ 23).

Individuals who called the advertised toll-free number were given an appointment to discuss the program with a sales representative from Raintree,[2] a company controlled by Percudani. Soon after, they received a letter confirming the appointment date and promoting the Why–Rent program. (Doc. 1 ¶ 29). The letter repeats the promise that participants can choose from "many models ... for $1,000 down and $685 a month," but states, in "the fine print," that this price is "based on a purchase price of $126,718 and $972.65 per month for the first 12 months and a mortgage of $114,046.20 financed for 30 years at 6% adjustable rate resulting in a

payment of $685.00 per month for qualified applicants." (Doc. 1 ¶ 30).

Plaintiffs allege that Percudani, and the companies through which he operated, knew that none of those responding, who were mostly low-income renters in the New York City area, would be considered a "qualified applicant," and that none would be entitled to the advertised prices. (Doc. 1 ¶¶ 31–32). Thus, according to plaintiffs, these statements constituted fraudulent and deceptive inducements to the consumers. (Doc. 1 ¶ 32).

At the appointments, Raintree sales representatives discussed the location of the homes in relation to New York City, features available in the homes, and the financing terms available. (Doc. 1 ¶ 33; Docs. 125–126). Although sales representatives did not employ a "script" or consistent sales presentation, they consistently presented information concerning the Why–Rent program and the "Gold Key" program, under which Raintree offers to pay the consumer's current monthly rent in exchange for the consumer paying a set monthly fee directly to Raintree during the year in which it would take to build the home. (Doc. 1 ¶¶ 33–35; Docs. 125–126). These payments are ostensibly accumulated in a fund to be applied towards a down payment on the constructed home. (Doc. 1 ¶ 35).

After the customer enters into a contract for the construction of a home, employees of Chapel Mortgage, also controlled by Percudani, provide the individual with a "good-faith estimate" of the mortgage payments, an amount that is "always higher than the $685 per month promised in the advertisements." (Doc. 1 ¶ 45). Chapel Mortgage employees also request from the customer a loan application and credit history, and these employees allegedly eliminate any "blemishes" on these documents before submitting an application to Chase,[3] which underwrites the loan.

1. In accordance with the standard of review for a motion for class certification, the court will present the facts substantially as alleged in plaintiff's complaint, with some minor deviations based on supplemental discovery undertaken with court approval. (Doc. 156).

2. According to the complaint, Chapel Homes was the predecessor of Raintree and, like Raintree,

was controlled by Percudani. (Doc. 1 ¶ 12). For purposes of this opinion, any reference to Raintree should be interpreted to apply also to Chapel Homes.

3. According to the complaint, Spaner was the employee of Chase responsible for the purchase of the loans. (Doc. 1 ¶ 16).

(Doc. 1 ¶ 41). In connection with the financing arrangement, Raintree representatives arrange for an appraisal of the property by Stranieri, who allegedly intentionally overvalues all properties "by approximately 35% to 45% of their actual value." (Doc. 1 ¶ 48). This inflated valuation, along with the consumer's altered credit application, allows Chase to approve a loan for a substantially higher amount than for which the consumer would normally be eligible. (Doc. 1 ¶ 51). According to plaintiffs, Chase "abandon[s]" its normal underwriting procedures to achieve this result. (Doc. 1 ¶¶ 55–56). The customer is never informed of the affiliations and relationships among the various defendants.

At closing, customers learn that their actual mortgage payment will be significantly higher than the "good-faith estimate" previously provided, but, "[a]t this point, [they have] no option other than to close on the loan ... for fear of losing a substantial sum of money already paid" to Raintree and other defendants. (Doc. 1 ¶ 60). The customer is also informed of the amount of their escrow payments. However, Chase determines the customer's monthly payments based on "the assessment of property as undeveloped land (notwithstanding the fact that a completed house now exists on the property), and[,] as a result, the tax figures contained in the settlement sheet are unreasonably and unrealistically low." (Doc. 1 ¶ 59).

Customers execute a promissory note and mortgage, which is sold immediately to Chase. Chase then pays the inflated sales value to Percudani, Raintree, or Chapel Mortgage, "thereby allowing [these entities] to profit from their fraud." (Doc. 1 ¶ 63). Chase, in turn, sells the loan to another entity under a pooling agreement, allowing it to recover the principal of the loan and additional premium payments. (Doc. 1 ¶ 64).

After approximately thirteen months, a reassessment significantly raises the tax val-

uation of developed property. (Doc. 1 ¶ 68). Chase sends a letter to customers, advising them that their mortgage payments have increased and that the current escrow account, based on the tax assessment of the undeveloped property, is underfunded. (Doc. 1 ¶¶ 68–69). Consumers who are unable to meet the substantial payment increase and the escrow shortfall are forced to default on their mortgage. As a result, many of the homes sold by Percudani lapse into foreclosure. (Doc. 1 ¶¶ 69–70). Those customers who can avoid foreclosure must continue to make the increased mortgage payments and are saddled with a home worth 35% to 45% less than what they paid. (Doc. 1 ¶ 72).

On June 28, 2001, plaintiffs filed a complaint seeking relief under the civil remedy provisions of both RICO, 18 U.S.C. § 1964(c), and the Pennsylvania UTPCPL, PA. STAT. ANN. tit. 73, § 201–9.2. (Doc. 1 ¶¶ 158–97). Specifically, plaintiffs allege that (1) Percudani, Raintree, Chapel Mortgage, and Chapel Hill, in violation of 18 U.S.C. § 1962(c), engaged in a "pattern of racketeering activity," predicated on acts of wire and mail fraud; (2) Stranieri, Chase, and Spaner, in violation of 18 U.S.C. § 1962(d), conspired with Percudani, Raintree, Chapel Mortgage, and Chapel Hill to violate 18 U.S.C. § 1962(c); and (3) all defendants, in violation of PA. STAT. ANN. tit. 73, §§ 201–3, 201–2(4)(iii), (xxi), caused a "likelihood of confusion or of misunderstanding as to affiliation, connection or association with ... another" and engaged "in any other fraudulent or deceptive conduct [creating] a likelihood of confusion or of misunderstanding."[4] (Doc. 1 ¶¶ 158–97). On September 27, 2001, plaintiffs filed the present motion, seeking class certification under Federal Rule of Civil Procedure 23(b)(3). (Docs. 39, 40).

## II.  *Standard of Review*

Motions for class certification mandate an intensive and rigorous examination of the

---

4.  In the complaint, plaintiffs also alleged that (4) all defendants, in violation of PA. STAT. ANN. tit. 73, §§ 201–3, 201–2(4)(v), (ix), represented "that goods or services have sponsorship, approval, characteristics, [or] benefits ... that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does

not have" and advertised "goods or services with intent not to sell them as advertised"; and (5) all defendants committed common law negligent misrepresentation. The court previously dismissed these counts for failing to state a claim upon which relief could be granted. (Doc. 155).

factual and legal claims to determine whether the requirements of Federal Rule of Civil Procedure 23 have been met. *Gen. Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 160, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982). Courts generally should accept the allegations presented in the complaint; however, "it may be necessary for the court to probe behind the pleadings before coming to rest on the certification. question." *Id.* While these proceedings should not evolve into a full trial or involve a final determination of the viability of a claim, a "preliminary inquiry into the merits" is sometimes necessary. *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 259 F.3d 154, 186 (3d Cir.2001) (quoting *Szabo v. Bridgeport Machs., Inc.,* 249 F.3d 672, 676 (7th Cir.2001)). Essentially, pragmatism guides the depth of the class certification question: the court should engage in the factual investigation suggested by the circumstances of the individual case. *See id.* at 168 (stating that the nature of the case may determine the proper standard of review).

### III. *Discussion*

Federal Rule of Civil Procedure 23 mandates a two-stage analysis for the certification of a class. Initially, the party seeking class certification must establish four prerequisites: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy of representation. FED. R. CIV. P. 23(a); *Johnston v. HBO Film Mgmt.,* 265 F.3d 178, 183 (3d Cir.2001). Once the moving party satisfies this burden, it must additionally demonstrate that the class action falls within one of the three enumerated categories of subsection (b). FED. R. CIV. P. 23(b); *Johnston,* 265 F.3d at 183. Specifically, subsection (b)(3), the part under which plaintiffs are proceeding in this case, permits the maintenance of a class action if "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." FED. R. CIV. P. 23(b); *Johnston,* 265 F.3d at 183.

### A. Prerequisites for a Class Action Under Rule 23(a)

#### 1. Numerosity

■ The numerosity aspect of certification requires the class to include enough persons so that "joinder of all members is impracticable." FED. R. CIV. P. 23(a). As other courts have noted, no "magic number" exists at which numerosity is satisfied, and the moving party is not required to establish conclusively the final number of likely members. *Strain v. Nutri/System, Inc.,* No. Civ. A. 90–2772, 1990 WL 209325, at *3 (E.D.Pa. Dec.12, 1990); *see also Weiss v. York Hosp.,* 745 F.2d 786, 808 (3d Cir.1984). However, classes that include several hundreds or thousands of members generally suffice for purposes of this prerequisite. *Id.* at 808 n. 35 ("[N]umbers in excess of forty, particularly those exceeding one hundred or one thousand have sustained the requirement.") (quoting 3B J. MOORE, MOORE'S FEDERAL PRACTICE ¶ 23.05[1] (2d ed.1982)).

In this case, plaintiffs allege that the class includes "hundreds, if not thousands," of "renters of low– and fixed-income in the New York Metropolitan Area." (Doc. 40). Accepting the veracity of this averment, it appears that joinder plainly would be impracticable due to the number of individuals involved.[5] Accordingly, the proposed class satisfies the numerosity requirement of Rule 23.

#### 2. Commonality

■ Commonality under subsection (a) of Rule 23 requires only that "the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 148 F.3d 283, 310 (3d Cir.1998). This inquiry, much less rigorous than the predominance analysis under subsection (b), may be satisfied simply by showing that all proposed class members must prove a single common legal element. *Johnston,* 265 F.3d at 183.

---

5. Indeed, defendants do not appear to argue that plaintiff failed to satisfy the numerosity requirement and instead choose to focus on issues of commonality and predominance. (Docs. 11, 44; *but see* Doc. 86).

A cursory review of the elements of plaintiffs' claims under RICO and the Pennsylvania UTPCPL shows that all potential members of the class share at least one common legal and factual burden. Specifically, both claims require plaintiffs to prove that the alleged fraudulent or deceptive conduct caused harm to the plaintiffs. *Compare* 18 U.S.C. § 1964(c) (providing civil remedy for any person injured "by reason of" a violation of RICO); *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 267–68, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992) (interpreting provision as establishing proximate causation requirement), *with* PA. STAT. ANN. tit. 73, § 201–9.2(a) (providing civil remedy for any person injured "as a result of" a violation of the Pennsylvania UTPCPL); *Weinberg v. Sun Co.*, 565 Pa. 612, 777 A.2d 442, 446 (2001) (interpreting provision as establishing causation requirement). All members of the proposed class must present evidence that defendants' allegedly deceptive acts caused harm in the form of overpriced valuations and increased mortgage payments. Thus, the court finds that plaintiffs have satisfied the commonality prerequisite for a class action.

### 3. Typicality

■ To establish typicality, plaintiffs must show that their claims arise from factual and legal bases similar to those of other potential class members. *Johnston*, 265 F.3d at 183. This prerequisite does not mandate factual identity of each individual cause of action, but, rather, requires only that the claims share a common legal foundation. *Id.* Indeed, significant factual differences in individual claims do not preclude certification, provided that the legal theories employed by the representatives and the proposed class coincide. *Cullen v. Whitman Med. Corp.*, 188 F.R.D. 226, 230 (E.D.Pa.1999) (citing

*Baby Neal v. Casey*, 43 F.3d 48, 57 (3d Cir.1994)).

In the present case, plaintiffs allege that they and all proposed class members saw the same false advertisements, received the same misleading letter, and made payments as part of a coordinated, fraudulent scheme. Although plaintiffs and members of the proposed class received varying oral presentations during their individual meetings with defendants, both the putative representatives and members base their claims on the same underlying theory: defendants' misrepresentations and fraudulent actions caused economic injury to plaintiffs in connection with the purchase and mortgage of their homes.[6] At the least, it appears clear that plaintiffs' theories do not present a significant chance of conflict with other members' claims. Accordingly, the court finds that plaintiffs have satisfied the prerequisite of typicality.

### 4. Adequacy of Representation

■ The final prerequisite under subsection (a) of Rule 23 ensures that "the representative parties will fairly and adequately protect the interests of the class." FED. R. CIV. P. 23(a)(4). To satisfy this condition, plaintiffs must show both that the attorneys of the representative parties are qualified to prosecute the class action on behalf of the class members and that no conflicts of interest would likely hinder the representatives from advocating the class members' claims. *Prudential Ins. Co.*, 148 F.3d at 312.

Courts generally presume that counsel are competent to handle class action litigation in the absence of evidence to the contrary and have eschewed any litmus test for counsel seeking to represent a class. *See Szczubelek v. Cendant Mortgage Corp.*, 215 F.R.D. 107 (D.N.J.2003). In cases in which a party disputes this issue, the factual inquiry turns

---

**6.** Defendants argue, in a conclusory manner, that typicality is lacking because "unique defenses" exist to the claims of the plaintiff and proposed members. (Doc. 11, 86). Although it is unclear to what defenses they are referring, defendants have asserted the applicable statute of limitations as a defense to actions by certain plaintiffs. (Doc. 124). Even if the court later finds that the statute of limitations applies, this determination goes to the merits of plaintiffs' claims, and is

inappropriate for resolution on a motion for class certification, which examines only whether plaintiffs' causes of action are susceptible to class treatment. *See Cullen*, 188 F.R.D. at 230 ("While the statute of limitations defense may ultimately affect an individual's right to recover, it does not affect the presentation of the liability issues for the plaintiffs' class."). Thus, possible application of statute of limitations defenses does not preclude a finding of typicality.

substantially on the attorney's experience in previous class action litigation but also considers the quality of the attorney's performance and filings in the present case. *See Szczubelek*, 215 F.R.D. at 120 (citing cases); *In re Chambers Dev. Sec. Litig.*, 912 F.Supp. 822, 836 (W.D.Pa.1995). In the present case, plaintiffs' counsel include practicing attorneys from Milberg Weiss Bershad Hynes & Lerach LLP and Seeger Weiss LLP, preeminent law firms with extensive experience in prosecuting class actions. (*See, e.g.,* Doc. 40, Ex. A). Further, briefs submitted on behalf of plaintiffs thus far exhibit a high level of skill and professionalism, obviously sufficient to manage a class action case.[7] Accordingly, the court finds that plaintiff attorneys are competent to handle the claims of the proposed class.

The second aspect of the adequacy inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997). In contending this point, defendants argue that the individual circumstances of the representative plaintiffs, specifically the differences in value of their homes, show that the named plaintiffs did not suffer the same injury as other proposed class members. Further, according to defendants, plaintiffs lack knowledge of "basic facts" of the case because the complaint includes false allegations. (Doc. 80). While these points may be relevant to the discussion of predominance, they are not pertinent to the question of adequacy of representation. *See Newton*, 259 F.3d at 186 ("[T]he standards for measuring the predominance of common issues under [Rule 23(b)(3)] should not be imputed to adequacy of representation."). Plaintiffs allege that they and other proposed class members were defrauded in the same manner by the same fraudulent scheme perpetrated by defendants, and plaintiffs share the same interest in the litigation: recovery of their alleged losses. Differences in property valuations and other aspects of claimed damages do not create a conflict between the proposed class representatives and members. Additionally, disagreements between plaintiffs and defendants as to the "basic facts" of the case do not preclude certification, but merely show the existence of factual disputes, a common occurrence in litigation. Plaintiffs' claims and interests appear approximately coextensive with those of the proposed class, and, accordingly, the court finds that plaintiffs have satisfied the final prerequisite of subsection (a) of Rule 23.

**B. Requirements for Maintenance of a Class Action Under Rule 23(b)**

**1. Predominance**

▆ Like the commonality prong of subsection (a), predominance dissects the individual claims of proposed class members to ensure that all share a common legal or factual basis. *See, e.g., Johnston*, 265 F.3d at 183; *Szczubelek*, 215 F.R.D. at 120. However, unlike commonality, predominance also measures the number and relative importance of these common issues against the remaining individual issues not susceptible to class-wide proof.[8] *See id.* This inquiry, more so than other aspects of the certification determination, requires a close examination of the underlying claims to determine whether common legal elements pervade the class. *Id.* at 186–87; *Newton*, 259 F.3d at 166–67, 172.

Although RICO and the Pennsylvania UTPCPL differ substantively in many aspects, they are facially similar in that both

---

7. Although defendants dispute the competency of counsel on grounds that the plaintiffs' complaint contains "apparent factual contradictions," such arguments are common in—and, in fact, form the driving force behind—our adversarial system. The court's review of the complaint and other documents filed by plaintiffs discloses no instances in which potential inconsistencies could be attributed to the incompetency of counsel rather than differing interpretations of underlying occurrences.

8. This distinction may be clarified by analogy to the legal standards of sufficiency and weight of the evidence: Commonality measures the sufficiency of the evidence, testing only whether a plaintiff has properly alleged a single common issue, while predominance examines the weight of the evidence, analyzing whether the number of common issues clearly outweighs individual issues.

define a range of prohibited activities for which criminal liability may be imposed and then, in a separate section, establish a civil remedy for certain individuals harmed by a violation of the statute. Specifically, the RICO and Pennsylvania UTPCPL civil remedy provisions provide a cause of action, respectively, for "[a]ny person injured in his business or property by reason of a violation," 18 U.S.C. § 1964, and for "[a]ny person who ... suffers any ascertainable loss of money or property ... as a result of" a violation of the statute, PA. STAT. ANN. tit. 73, § 201–9.2. Thus, both statutes require plaintiffs to prove the fact of injury in order to establish liability.

It is on the issue of damages that the claims of the potential class members in this case diverge. Although several courts have noted that variations in the *amount* of damages do not preclude certification, this conclusion does not obviate the need for plaintiffs to establish the *fact* of damages when class-wide injury cannot be presumed and forms an essential element of their case. *See Newton,* 259 F.3d at 188 (citing *Bogosian v. Gulf Oil Corp.,* 561 F.2d 434, 454 (3d Cir. 1977)). In this case, the injuries alleged are economic in nature and consist of the increased mortgage payments and fees that class members must pay allegedly as a result of the inflated home appraisals, the low tax assessments provided before closing, and the incorrect estimated monthly mortgage payments provided before and at closing. Thus, the very fact of injury, apart from the amount of damages, depends almost entirely on individual circumstances: the difference between the appraised value and the actual value of the home, the difference in the tax assessment provided at closing and the reassessment conducted later, and the difference between the mortgage payments that each buyer should have made (according to defendants' estimates and the buyer's credit record) and the payments each buyer actually made. The issue of damages, a prerequisite of claims under both RICO and the Pennsylvania UTPCPL, presents the court with the

prospect of holding hundreds or thousands of individual hearings.[9]

Under certain circumstances, courts may presume class-wide damage on the basis of "fraud on the market," or a similar theory, under which the fraudulent conduct itself causes injury regardless of the nature of individual transactions. These cases often arise in the context of securities fraud, when a company implements a common excessive pricing policy for shares, meaning that any individual who purchases shares at the price is injured, regardless of the circumstances of the sale itself or the particular amount of damages involved. *See Newton,* 259 F.3d at 188; *cf. Cullen,* 188 F.R.D. at 234–35 (presuming class-wide damages to students who attended a vocational school alleged to be a "complete sham" because, if proven, any student who attended the school would have paid money yet received no benefit). The allegations in this case do not permit such a presumption. Plaintiffs do not suggest that the houses were valueless, or that all purchasers suffered injury as a result of a common event. Rather, plaintiffs claim that purchasers were defrauded individually, and as a result of each specific transaction, by the inflated appraisals and deceptive mortgage estimates. That the individuals were allegedly defrauded in a similar manner does not establish common injury. Regardless of similarity in the nature of alleged harm, each claimant will inevitably need to provide proof that his or her damages resulted from his or her own transaction, a conclusion that demonstrates the predominance of individual, not common, issues. The impossibility of class-wide proof of damages precludes certification of the class under either claim.

Additionally, both claims implicate causation concerns that militate against a finding of predominance. RICO and the Pennsylvania UTPCPL require, respectively, that plaintiffs' injuries be "by reason of" and "as a result of" a violation of the statutory prohibitions. *Compare* 18 U.S.C. § 1964(c), *with* PA. STAT. ANN. tit. 73, § 201–9.2. Although

---

**9.** The difficulty in establishing damages for standing purposes is matched by the subsequent challenge that would inhere in determining the precise quantum of damages suffered by each plaintiff.

federal [10] and state courts [11] have struggled to define the burden that these provisions impose on plaintiffs, it is now generally accepted that both statutes require, at the least, a showing of proximate causation. *See Holmes*, 503 U.S. at 267–68, 112 S.Ct. 1311; *Weinberg*, 777 A.2d at 446. Thus, to satisfy RICO and the Pennsylvania UTPCPL, plaintiffs must show that the fraudulent advertisements and letters, the failure of defendants to disclose their business affiliations and relationships, or the allegedly improper appraisals and estimates actually caused plaintiffs to purchase the homes at an inflated price. Even assuming individual reliance need not be proven, causation will depend significantly on the individual circumstances of the buyers and their reactions to the allegedly deceptive conduct of defendants. *Cf. Cullen*, 188 F.R.D. at 232–33 (stating, in context of motion for class certification of RICO claim, that "contrasting reliance and causation is simply noting a distinction without a difference" and that "proof of proximate cause is fraught with the same evidentiary trappings as proof of reliance"); *Aronson v. Green-Mountain.com*, 809 A.2d 399, 403–04 (Pa.Su-

per.Ct.2002) (affirming denial of certification on claim under Pennsylvania UTPCPL because individual causation issues would dominate). Although the fraudulent acts themselves may be common to the proposed class, issues of causation and proof of damages mandate the conclusion that individual issues will predominate in a class action of this type. Accordingly, the motion for certification must be denied.

### 2. Superiority

■ The superiority inquiry under subsection (b) centers on whether a class action provides the most efficient forum for disposing of plaintiff's claims. Rule 23 suggests four non-exhaustive factors of importance:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be en-

10. With respect to RICO, several courts within the Third Circuit have concluded that reliance is an element of plaintiff's claim in an action under RICO predicated on mail and wire fraud, *see Smith v. Berg*, No. Civ. A. 99–CV–2133, 2001 WL 1169106, at *3–4 (E.D.Pa.Oct. 1, 2001); *Warden v. McLelland*, No. Civ. A. 99–5797, 2001 WL 910934, at *10 & n. 5 (E.D.Pa. Aug.8, 2001); *Allen Neurosurgical Assocs., Inc. v. Lehigh Valley Health Network*, No. Civ. A. 99–4653, 2001 WL 41143, at *4 & n. 3 (E.D.Pa. Jan.18, 2001); *N.J. Carpenters Health Fund v. Philip Morris, Inc.*, 17 F.Supp.2d 324, 339 n. 19 (D.N.J.1998); *Truckway, Inc. v. General Elec.*, No. Civ. A. 91–0122, 1992 WL 70575, at *6 (E.D.Pa. Mar.30, 1992); *Rosenstein v. CPC Intern., Inc.*, No. Civ. A. 90–4970, 1991 WL 1783, at *3–4 (E.D.Pa. Jan.8, 1991); *Matjastic v. Quantum Pharmics, Ltd.*, No. Civ. A. 90–0647, 1991 WL 238304, at *4–5 (E.D.Pa. July 22, 1991); *Strain v. Nutri/System, Inc.*, No. Civ. A. 90–2772, 1990 WL 209325, at *4–5 (E.D.Pa. Dec.12, 1990); *see also Tabas v. Tabas*, 47 F.3d 1280, 1294 n. 18 (3d Cir.1995), while others have concluded that plaintiffs need to show only proximate causation, *see Kaiser v. Stewart*, No. Civ. A. 96–6643, 1997 WL 476455, at *6 (E.D.Pa. Aug.19, 1997); *Keystone Helicopter v. Textron Inc.*, No. Civ. A. 97–257, 1997 WL 786453, at *4 (E.D.Pa. Dec.02, 1997); *Schuylkill Skyport Inn, Inc. v. Rich*, No. Civ. A. 95–3128, 1996 WL 502280, at *15 (E.D.Pa. Aug.21, 1996);

*Rodriguez v. McKinney*, 878 F.Supp. 744, 746–49 (E.D.Pa.1995); *Am. Health Systems, Inc. v. Visiting Nurse Ass'n of Greater Phila.*, No. Civ. A. 93–542, 1994 WL 314313, at *6–7 (E.D.Pa. June 29, 1994); *Prudential Ins. Co. of Am. v. United States Gypsum Co.*, 828 F.Supp. 287, 294–96 (D.N.J. 1993); *Korman v. Trusthouse Forte PLC*, No. Civ. A. 89–8734, 1990 WL 83353, at *6 n. 7 (E.D.Pa. June 15, 1990) (Hutton, J.), while at least one other court has concluded that "contrasting reliance and causation is simply noting a distinction without a difference," *Cullen v. Whitman Med. Corp.*, 188 F.R.D. 226, 232–33 (E.D.Pa.1999). As in *Cullen*, it is unnecessary for the court in the context of this case to resolve this split.

11. Similarly, Pennsylvania courts have disagreed on whether *Weinberg v. Sun Co.*, 565 Pa. 612, 777 A.2d 442 (2001), in which the Pennsylvania supreme court held that reliance was an element of claims under one subsection of the Pennsylvania UTPCPL, imposes a similar reliance requirement on plaintiffs bringing claims under other subsections of the Pennsylvania UTPCPL. *Compare Skurnowicz v. Lucci*, 798 A.2d 788 (Pa.Super.Ct.2002) (imposing reliance requirement), *with Commonwealth v. Percudani*, 825 A.2d 743 (Pa.Cmwlth.Ct.2003) (refusing to impose reliance requirement). Again, it is unnecessary for the court in the context of this case to determine how the Pennsylvania supreme court would rule on this issue.

countered in the management of a class action.

FED. R. CIV. P. 23(b)(3). In conducting this analysis, courts often consider the probable financial resources of members of the class and the financial incentives, or lack thereof, to vindicate their claims. *See, e.g., Cullen,* 188 F.R.D. at 235; *Strain,* 1990 WL 209325, at *7.

The individual and complex issues relating to causation and damages, discussed previously in the context of predominance, also militate against finding that a class action is the superior method of adjudication of the potential claims here. The fact-specific nature of these determinations would require the court to hear from every member of the class, numbering potentially in the thousands, and would present insurmountable manageability problems. Even if certain issues, such as the fraudulent and inducing character of the advertisements and mailings could successfully be severed from the remaining causation and damages questions, the resolution of these relatively simple claims in the form of a class action presents no greater benefit to the claimants than the application of preclusion doctrines in future cases.

Lastly, the court notes that a class action appears unnecessary because persons with a viable claim should have sufficient incentive to bring their claims individually. While the court is not unsympathetic to the practical and financial difficulties faced by first-time home buyers in negotiating the legal landscape without the advantages of class representation, these obstacles simply do not present a situation in which the cost of litigation clearly outweighs potential recovery. According to plaintiffs' complaint, many of those harmed by defendants' actions suffered foreclosure on their homes, and all participating home buyers endured inflated mortgage payments. Although many of these individuals are described as "low-income renters," both RICO and the Pennsylvania UTPCPL include fee-shifting provisions, allowing the recovery of attorney's fees. 18 U.S.C. § 1964(c); PA. STAT. ANN. tit. 73, § 201–9.2(a). Thus, these individuals should have both the means and the incentive to pursue their claims individually. Because claimants have allegedly suffered substantial loss and may recoup costs of counsel through fee-shifting provisions, and because individual issues clearly predominate, the class action is not a superior method to adjudicate the claims.

## IV. Conclusion

For the foregoing reasons, the court will deny plaintiffs' motion for class certification and will grant defendants' motion to strike class action allegations. *See* FED. R. CIV. P. 12(f) ("[T]he court may order stricken from any pleading any . . . immaterial . . . matter."); FED. R. CIV. P. 23(d) (stating that the court may "requir[e] that the pleadings be amended to eliminate therefrom allegations as to representation of absent persons"). An appropriate order will issue.

### ORDER

AND NOW, this 15th day of September, 2003, for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that:

1. Plaintiffs' motion for class certification (Doc. 39) is DENIED.

2. Defendants' motion to strike class action allegations (Doc. 10) is GRANTED. Plaintiffs shall file an amended complaint deleting all class action allegations within twenty days of the date of this order.