**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-1228
_____

REYNALDO REYES,
on behalf of himself and all others similarly situated,
Appellant

v.

NETDEPOSIT, LLC; MP TECHNOLOGIES d/b/a Modern
Payments; TELEDRAFT, INC.; NATIONAL PENN BANK;
WELLS FARGO BANK, N.A.; WACHOVIA BANK, N.A.;
ZIONS FIRST NATIONAL BANK

_____

APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA
(D.C. No. 2-10-cv-00345)
District Judge: Honorable Juan R. Sánchez
_____

Argued
September 11, 2014
_____

Before: MCKEE, *Chief Judge*, SMITH and SHWARTZ,
*Circuit Judges*

(Opinion Filed: September 2, 2015)
_____

Howard I. Langer, Esq. (**ARGUED**)
John J. Grogan, Esq.
Edward Diver, Esq.
Irv Ackelsberg, Esq.

1

Peter E. Leckman, Esq.
LANGER, GROGAN & DIVER, P.C.
1717 Arch Street, Suite 4130
Philadelphia, PA 19103

     *Attorneys for Appellant*

Jason A. Snyderman, Esq. (**ARGUED**)
Grant S. Palmer, Esq.
William R. Cruse, Esq.
Bridget E. Mayer, Esq.
Blank Rome LLC
One Logan Square
Philadelphia, PA 19103

     *Attorneys for Appellees*

Charles L. Becker, Esq. (**ARGUED**)
Kline & Specter, PC
1525 Locust Street, 19th Floor
Philadelphia, PA 19102

     *Attorney for Amici Curiae*
     *Public Interest Law Center of Philadelphia and*
*Community Legal Services*

Julie Nepveu, Esq.
AARP Foundation Litigation
Room B4-245
601 E Street, N.W.
Washington, DC 20049

     *Attorney for Amici Curiae AARP, National*
*Association of Consumer Advocates, National*
*Consumer Law Center and Consumer Federation of*
*America*

Richard B. Tucker, III, Esq.
Tucker Arensberg
1500 One PPG Place
Pittsburgh, PA 15222

     *Attorney for Amici Curiae American Bankers*

2

*Association and Independent Community Bankers of America*

Robert J. LaRocca, Esq.
Kohn, Swift & Graf
One South Broad Street
Suite 2100
Philadelphia, PA 19107

*Attorney for Amici Curiae Richard Blumenthal, Robert Casey, Edward J. Markey and Allyson Y. Schwartz*

Francis X. Riley, III, Esq.
Charles M. Rowan, Jr., Esq.
Saul Ewing
650 College Road East
Suite 100
Princeton, NJ 08540

*Attorney for Amicus Curiae Risk Management Association*

_____

OPINION OF THE COURT
_____

McKEE, *Chief Judge*.

Reynaldo Reyes appeals the District Court's denial of his motion to certify a class to sue for alleged civil violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c), (d). The defendants are Zions First National Bank ("Zions Bank") and its payment-processor subsidiaries, Netdeposit, LLC and MP Technologies (together, "Modern Payments").

Reyes alleges that the defendants conspired to conduct a fraudulent telemarketing scheme that caused unauthorized debits from bank accounts owned by himself and members of the proposed class.

3

The District Court held that class certification was inappropriate because there were no issues common to the class and Reyes could therefore satisfy neither the commonality requirement of Federal Rule of Civil Procedure 23(a), nor the predominance requirement of Rule 23(b)(3). This interlocutory appeal followed.[1]

## I.    BACKGROUND

Reyes alleges that the defendants conspired to conduct a fraudulent scheme whereby certain telemarketing firms would contact unsuspecting individuals and offer them something of little or no value.  Reyes alleges that, during unsolicited phone calls with unsuspecting consumers, the telemarketers would obtain bank account information which was used to make unauthorized debits from the the consumers' bank accounts.[2]  In Reyes' case, in an unsolicited phone call in November 2007, telemarketer NHS Systems told Reyes that he qualified for a free government grant. NHS Systems then requested Reyes' bank account information, which he provided.

Telemarketers such as NHS Systems cannot readily obtain funds directly from consumers' bank accounts because most banks are extremely reluctant to allow them to debit accounts.  Accordingly, telemarketers usually contract with payment processing entities that debit bank accounts on the

---

[1] *See* 28 U.S.C. § 1292(e); Fed. R. Civ. P. 23(f).  The District Court also granted various *amici curiae* leave to file briefs in support of Reyes' motion for class certification.

[2] Reyes alleges that, besides phone-based marketing, the scheme included deceptive mailers, Internet solicitation, and "slamming," a process whereby a telemarketer acquires a consumer's bank account information from another entity and either contacts the consumer under the pretense of attempting to verify the information or simply transfers money from the consumer's account.  JA 513-15.
Because Reyes alleges that the merchants operated in the same way and as part of a fraudulent enterprise, Appellant Br. at 18, we refer to all of them as "telemarketers" for the sake of simplicity.

telemarketer's behalf. In Reyes' case, NHS Systems did exactly that. It provided Reyes' bank account information to Modern Payments, a third-party payment processing agency and subsidiary of Zions Bank. Modern Payments then caused Zions Bank to initiate an Automated Clearing House ("ACH") debit of Reyes' bank account at Commerce Bank. Pursuant to Zions Bank's request, Reyes' funds on deposit with Commerce Bank were transferred to Modern Payments' account at Zions Bank, and ultimately transferred to NHS Systems, the Originator. Two debits were processed from Reyes' account using this ACH debit process, one for $29.95 and another for $299.95.[3] *Reyes v. Zions First Nat'l Bank*, --- F. Supp. 2d ---, Civ. Action No. 10-345, 2013 WL 5332107, at *1 (E.D. Pa. Sept. 23, 2013).

The ACH debit process is an alternative to traditional checking which is based on the transfer of paper instruments. When an ACH transfer occurs, an Originating Depository Financial Institution, like Zions Bank, initiates an ACH entry at the request of an Originator (such as NHS Systems). Such requests can also be made through third parties at the request of the Originator. As we have just explained, Reyes alleges that Modern Payments caused Zions Bank to take ACH debits from bank accounts owned by him and other members of the putative class at the request of the telemarketers, like NHS Systems.

The Originating Depository Financial Institution (here, Zions Bank) aggregates payments from customers and transmits the payments in batches to an ACH Operator (either the Federal Reserve or the Clearing House). The Operator receives and sorts the batched payments and makes the funds available to the Receiving Depository Financial Institution. That institution, in turn, debits or credits the relevant account based on the ACH entry. Here, Reyes alleges that Modern

---

[3] Although many (if not all) of the debits involved in this appeal are sufficiently small to be considered *de minimis* by some, the cumulative amount is substantial. In fact, the conduct alleged here has attracted the attention of the impressive array of amici who have filed briefs in this matter, including the AARP, four members of the United States Congress, and the American Bankers Association.

Payments credited the accounts of each of the telemarketers in the amount of funds fraudulently debited from unsuspecting victims. Both Modern Payments, as payment processor, and Zions Bank, as the processor's bank, would have collected a fee and then deposited the balance of amounts debited from consumers directly into the account of the telemarketer.[4]

Reyes alleges that his bank account and the accounts of other consumers subjected to this fraudulent enterprise did not have sufficient funds to satisfy many of the unauthorized debits.[5] Reyes called NHS Systems to complain about the two withdrawals from his account, but he alleges NHS Systems provided him with a misleading audio recording.[6]

Thereafter, Reyes initiated this action on behalf of himself and a class of all individuals in the United States as to whom ACH debit entries or [remotely created check] drafts on their accounts were prepared by defendants Netdeposit, Modern Payments, or Teledraft during the four-year period immediately preceding the filing of this action and finally charged to the class members' bank accounts by a Telemarketer, or pursuant to information provided to defendants [Netdeposit, Modern Payments, or Teledraft] by

---

[4] Though this sounds cumbersome, it is nothing more than a series of computer entries or lines of computer code; the entire series of transactions can easily be completed, and the funds transferred and received, in one to two business days.

[5] It is not difficult to understand why the accounts did not have a sufficient balance to pay the amount of the attempted debits. If the depositors had never authorized the debits, they would have had no way of knowing that the balance in their accounts was not sufficient to satisfy the amounts of the attempted withdrawals and no reason to take steps to ensure that their balances were sufficient to cover those debits.

[6] According to NHS Systems, the recording established that Reyes consented to the disputed debits.

the Telemarketers, or who otherwise incurred any bank charges as a consequence of such ACH debit entries or [remotely-created checks].

JA 526 ¶ 63.

The legal theory underlying this suit is that the defendants were operating a RICO enterprise that was a total sham.[7] The proof that Reyes offers to support that claim includes the inordinately high "return rates" of the telemarketers who did business with Modern Payments and Zions Bank. "Return rates" refer to how often an ACH debit cannot be completed. There are many reasons why a transaction may not be completed. These include (but are not limited to) insufficient funds or a customer complaint regarding the transaction. These complaints can result in the debited funds being credited back to the consumer's bank account. Return rates are collected by NACHA (previously known as the "National Automated Clearing House Association"), a not-for-profit association that administers and manages the ACH Network and other electronic transactions.

Reyes stresses that "the *lowest* return rate at issue [here] was *25 times* the national average of 1.25%." Appellant Br. at 26 (emphasis in original). Moreover, that was the telemarketer with the lowest rate. As Reyes notes, he produced testimony that "[m]ost were over 50 times that average." *Id.* at 25-26 (citing JA 661, 663). According to Reyes, the high return rates establish that Zions Bank and Modern Payments had reason to know that the telemarketers were engaged in fraudulent conduct.

Reyes produced additional evidence to support his argument. That evidence included internal e-mails wherein Zions Bank, Netdeposit, and Modern Payments discussed the

---

[7] As noted, Reyes alleges that this fraudulent scheme constituted an "enterprise" under RICO, 18 U.S.C. § 1962(c). However, since the only issue before us is the District Court's refusal to certify a class under Rule 23, we need not discuss the elements needed to prove a RICO conspiracy except insofar as they may bear upon issues of class certification.

"staggering" return rates, JA 686, and the "alarm" that their high return rates had caused NACHA. *Id.* at 814-15. According to Reyes, "[w]ithin the first three months of opening Modern Payments, for example, Zions was notified of the likelihood of fraud by the Federal Trade Commission ("FTC"), NACHA, and its own officers." Appellant Br. at 28. There was also evidence that these defendants communicated concern that they may be at risk for some of their business lines being used for money laundering. JA 692.

Reyes claims the evidence establishes that "[e]ach of the[] frauds operated in the same way, luring consumers with some kind of 'card' or 'benefit' to obtain their bank account information." Appellant Br. at 18.[8] These included "promises of un-secured loans, pre-paid credit cards, merchandise-club cards, identity-theft protection plans, and health-care discount plans." Meyer Decl., JA 1639-40 ¶ 19. Thus, although there is some variation in the "benefits" offered and the particular way each fraud was perpetrated, Reyes asserts that there is no need to examine each individual transaction "[b]ecause the business model of these schemes is inherently fraudulent[.]" Appellant Br. at 19.

## A. REYES' EXPERT WITNESSES

Reyes offered several witnesses at the hearing on class certification, including three experts. Amelia H. Boss, a Drexel Law School Professor, testified as an expert on banking and banking practices. Robert J. Meyer, a Wharton Business School Professor, and Barbara A. Blake, a former investigator for the Iowa Attorney General, both testified as experts on fraudulent marketing practices. Although we refer

---

[8] Reyes also cites numerous proceedings against some of the telemarketers involving the FTC and other entities that led to conclusions that the telemarketers were engaged in fraud. *See* Appellant Br. at 4, 16, 20-21. The defendants point out, and Reyes does not dispute, that the government enforcement actions involving the telemarketers in this case were initiated after the defendants stopped doing business with them, and the defendants were not themselves parties to any of those actions. Appellee Br. 49.

to their testimony throughout our discussion, it is helpful to provide an initial summary of the testimony of each.

### 1. Amelia H. Boss

Professor Amelia Boss repeatedly highlighted "the excessively high rates of returns generated by Modern Payments and its clients, of which Zions was well aware," and asserted that the rates provided clear evidence of fraudulent activity. Boss Decl., JA 582-92 ¶¶ 66-87. According to Professor Boss, most "banks never (or rarely) have debits returned as 'unauthorized.'" *Id.*, JA 582 ¶ 66. Indeed, Zions Bank did not have any unauthorized returns until it began working with Modern Payments. Boss pointed out that when Modern Payments and Zions Bank began working together in September 2006, the "number of unauthorized returns immediately began to increase dramatically from *zero . . .* to 799" in two months, and up to 2,632 unauthorized returns by February of the following year. *Id.*, JA 587-88 ¶ 78 (emphasis in original). According to Professor Boss, when adjusted for size, Zions Bank had the worst return rate of any bank in the country. *Id.*

Professor Boss also testified that Zions Bank had numerous NACHA violations, knew that many of its customers were high risk, and yet it completed inadequate due diligence. *Id.*, JA 587 ¶ 77. She explained that NACHA "prohibits the use of the ACH system for telemarking payments initiated by outbound telemarketing." *Id.*, JA 575 ¶ 46.[9] NACHA imposed this prohibition because it recognized that telemarketers have a high likelihood of fraud. *Id.*, JA 575 ¶ 46.

NACHA requires that transmission of debit and credit entries and entry of data over the ACH Network be entered with an appropriate label or code. *Id.*, JA 561-63 ¶¶ 15-16,

---

[9] *See also* Appellant Br. at 11-12 (discussing "rules that prohibit banks from entering transactions derived from outbound telemarketing (*i.e.*, the type of cold-calling that Mr. Reyes experienced).") (citing JA 672 (2008 ACH Rules, NACHA, Subsection 14.1.63)); Boss Decl., JA 597-601 ¶¶ 98-107.

18. For instance, transactions originating on the Internet, like those from the allegedly fraudulent Internet merchants here, are labeled "WEB," while certain telephone-initiated debits, like those from telemarketers, are labeled "TEL." *Id.*, JA 562-63 ¶ 18. According to Professor Boss, Zions Bank and Modern Payments failed to adhere to this policy because Modern Payments often labeled TEL or WEB transactions as "PPD" transactions. "PPD" refers to transactions that are "obtained in *pre-existing*, *signed writings*." *Id.*, JA 597-98 ¶ 99. They are, therefore, the safest category of transaction. Mislabeling made it appear that the consumer had actually authorized his or her bank account to be debited even though there were no such written agreements.

"Zions knew that th[ese] representation[s] w[ere] false." *Id.*, JA 597-98 ¶ 99. Yet, "[d]espite being advised of [its] use of improper codes[,] Zions continued to attach the false codes and continued to misrepresent the warranties." *Id.*, JA 598 ¶ 101. According to Reyes, the mislabeling made it possible to "hid[e] . . . the true source of the debits[]" "from victims' banks and regulators[.]" Appellant Br. at 30 (citing Boss Decl., JA 597-99 ¶¶ 98-102). If accepted by a factfinder, this testimony could obviously establish that the PPD code was used to conceal the true nature of these transactions. Accordingly, Professor Boss concluded that Zions Bank

> knowingly allowed the system to be used by High Risk originators[, like Modern Payments,] whom it had to know were engaged in fraud in clear disregard of the governing rules and standards, . . . made knowing misrepresentations to the other participants in the ACH system (including the consumer receivers), . . . facilitated the misuse of the system by Modern Payments and its customers, and . . . did all this knowing of facts from which, as a banking institution, it had to know fraud was taking place.

Boss Decl., JA 601 ¶ 107.

## 2. Robert J. Meyer

10

Professor Robert Meyer testified that the Federal Reserve Bank has concluded that 10% return rates are *prima facie* evidence of fraud.[10]  Meyer Decl., JA 1636 ¶ 11.b. Here, the return rates "rang[ed] from 30% to almost 90%[.]" *Id.*, JA 1636 ¶ 11.a.  In addition, Professor Meyer pointed to FTC enforcement actions and these telemarketers' products and services to conclude that the telemarketers operated "schemes designed to obtain victims' bank account information by deception and to use that information to debit victims' accounts as quickly [and] as often as possible before the victim understood what had occurred."  *Id.*, JA 1634-35 ¶¶ 8-9.

According to Professor Meyer, telemarketers NHS/PHS, the Platinum Benefit Group, Vexeldale (also known as Market Power Marketing Solutions, Sourdale, and ZaZoom), RxSmart, Low Pay, and Group One Networks offered a variety of products that were either valueless or significantly devalued.  *Id.*, JA 1633, 1639-40 ¶¶ 6, 19. Although there was some variation in the manner in which the unauthorized debits were accomplished, Professor Meyer concluded that they had the same components of deception: (1) each was obtained from a first party at a small or

---

[10] The defendants contest this statement, noting that "[t]*here is no law or regulation supporting this contention.*" Appellee Br. at 47 (emphasis in original).  Professor Meyer, like Investigator Blake and Reyes, who also refer to the Federal Reserve Bank's *prima facie* evidence of fraud, fails to include a source.  The record presented, however, does contain an unrelated complaint quoting an unnamed Federal Reserve official as writing that a 10% return rate "would likely be regarded by bank supervisory agencies and/or law enforcement agencies as prima facie evidence that your bank knew or should have known that your [third-party payment processors and/or merchants] had engaged in fraudulent activities."  JA 1695 ¶ 64 (alteration in original).  Despite whatever dispute the parties have regarding the Federal Reserve Bank's position on return rates, neither party disputes that the vast majority of U.S. banks have rates of returns that are close to (or actually are) zero, while here, that number is 30% to 90%.

11

negligible cost; (2) all were used to debit consumer accounts for exorbitant amounts, (3) none of these items conveyed any net value to the consumers, and (4) all were sufficiently complex, initially concealing their fraudulent nature to the victim. *Id.*, JA 1639-40 ¶ 19. Professor Meyer based his opinion on his review of "telephone scripts and web landing pages used in the marketing of the products and/or programs, internal e[-]mails, and tables of ACH return rates for the programs[.]" *Id.*, JA 1633 ¶ 6.

### 3. Barbara A. Blake

Reyes' expert Investigator Barbara Blake examined each scheme in detail and also stated that return rates over 10% were *prima facie* evidence of fraud. Blake Decl., JA 1614-15 ¶ 19.

Investigator Blake looked at the operations of each entity and other evidence before concluding that the telemarketers operate "fundamentally fraudulent schemes[.]" *Id.*, JA 1627-28 ¶ 85. She noted that the "[h]igh return rates are the plainest hallmark of mass-marketing fraud conducted through the banking system. This has been recognized in publications of the Comptroller of the Currency, FinCen, NACHA and the FDIC." *Id.*, JA 1614 ¶ 18.

Investigator Blake concluded that "each of the schemes at issue was a totally fraudulent mass-marketing fraud" because each of them "uses purported 'products' and 'services' that are routinely used as part of mass-marketing fraud schemes." *Id.*, JA 1613 ¶ 15. "Th[e] strong presumption of fraud [evidenced by the high return rates] is confirmed by the nature of the schemes . . . , which, once they are understood, are plainly fraudulent on their face." *Id.*, JA 1615 ¶ 21. Investigator Blake's conclusion was based on the telemarketers' sales scripts, the worthless nature of the purported "products," and the history of regulatory actions taken against the telemarketers and their principals. *Id.*, JA 1613-27 ¶¶ 15-84.

### B. FACT WITNESSES

12

The District Court also heard the testimony of two fact witnesses whose testimony will be discussed in greater detail below.[11] They were: Wayne D. Geisser, who was installed as the NHS Systems receiver after the FTC obtained a preliminary injunction against NHS Systems, and Jeanette A. Fox, who was a senior director of risk investigation at NACHA. Appellant Br. at 12, 26. Geisser and Fox testified that high return rates are not dispositive of fraud. Fox Dep., JA 2987-2991; Geisser Dep., JA 1155, 3055. Fox explained that an unauthorized return could be the result of a dispute over an agreement, the amount charged, or the timing of the charge. Fox Dep., JA 2975. Nevertheless, Fox did believe that the rate of returns here was high enough to warrant an investigation. *Id.*, JA 1145. Even she agreed that the rates strongly suggested fraud. *Id.*, JA 2977 (stating there is "[p]robably not" a legitimate reason for excessive return rates). Geisser testified that the NHS Systems health discount program brochures, fulfillment packages, purchase orders, and contracts with call centers appeared to be legitimate, Geisser Dep., JA 3049-50, even though he agreed that NHS Systems was totally fraudulent. *Id.*, JA 1161.

## C. DEFENDANTS' EXPERT WITNESSES

The defendants presented two experts: Kathleen O. Milner, an expert in the ACH Network and NACHA rules and guidance, who worked for many years in private financial services, and Peter G. Djinis, a lawyer who specializes in compliance concerning federal anti-money laundering and Bank Secrecy Act laws and regulations with experience in the Department of the Treasury.

### 1. Kathleen O. Milner

Kathleen Milner provided an overview of the ACH system and NACHA. She explained that, although "NACHA Operating Rules are contractually binding on parties to ACH payments," like the NACHA Operating Guidelines, they do not "have the force of law[.]" Milner Decl., JA 3781-82 ¶ 11.

---

[11] Fox and Geisser were called by plaintiff's counsel as "fact witnesses." JA 2696; Fox Decl., JA 2972.

Milner also discussed high return rates, noting that high returns rates "may be indicative of fraud," but believed that they are not "conclusive evidence of fraud." *Id.*, JA 3784 ¶ 17. In support of this assertion, Milner summarized various return codes that are used to identify transactions that are not properly authorized, highlighting the ones used in this case that are not dispositive of fraud. *Id.*, JA 3785-89 ¶¶ 20-29. She believed that, "without investigating the facts and circumstances of each purported fraudulent transaction, you are left simply with conjecture[]" about whether fraud is involved. *Id.*, JA 3789 ¶ 29. She also testified that, "[t]o conclude that the merchants were in fact complete frauds and to further conclude that the Zions Defendants knew them to be so would require an individualized analysis of each merchant and the Zions Defendants' relationship with each merchant." *Id.*

Milner rejected Reyes' assertion that the mislabeled codes (labeling "TEL" and "WEB" transactions as "PPD" transactions) indicate fraud. Rather, she concluded that the mislabeled classifications were the result of a problem with Modern Payments' software. *Id.*, JA 3791 ¶ 33. According to Milner, using the TEL code liberally, not solely when there was a preexisting relationship or consumer-initiated call was not fraud, but due, in part, to the fact that "the requirements of the TEL rule were broken up throughout the NACHA rulebook and were, therefore, difficult to locate and confusing to follow." *Id.*, JA 3794-95 ¶ 39.

Finally, Milner asserted that charging a fee for returned transactions was also not indicative of fraud because it is "accepted industry practice" to do so "as a disincentive for Originators having returned transactions and an incentive to obtain proper authorizations." *Id.*, JA 3795 ¶ 40.

## 2. Peter G. Djinis

Peter Djinis discussed various laws and regulations not at issue here, including Office of the Comptroller of the Currency bulletins, the Bank Secrecy Act, and the U.S. Patriot Act, Djinis Decl., JA 3767-70 ¶¶ 13, 16, 18-20, since Reyes alleges a RICO violation. Djinis also opined that Modern Payments and Zions Bank conducted adequate due

14

diligence of the telemarketers at issue.  *Id.*, JA 3772-76, ¶¶ 25-36.

## D.     REYES' USE OF THE EVIDENCE

Reyes relies on this record to allege that the defendants operated a RICO enterprise that was a "complete sham" lacking any legitimate business substance.  He draws upon this theory to overcome potential challenges to the predominance requirement for class certification.  Under the "complete sham" theory, the reviewing court can focus on the defendant's or defendants' conduct as a whole in order to find proof of elements that normally require evidence about each plaintiff, like plaintiff's reliance.  *Rosario v. Livaditis*, 963 F.2d 1013 (7th Cir. 1992); *Cullen v. Whitman Med. Corp.*, 188 F.R.D. 226 (E.D. Pa. 1999); *see also In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig.*, --- F.3d ---, Civ. Action No. 13-4273, 2015 WL 4547042, at *19, *21 (3d Cir. July 29, 2015).  "[T]he causation element of fraud and breach of contract can be satisfied through objective circumstantial evidence on a classwide basis."  Elizabeth J. Cabraser, *Trends and Developments in the Filing, Certification, Settlement, Trial and Appeal of Class Actions*, SE99 A.L.I.-A.B.A. 743, 821 (2000) ("[I]t is unnecessary and unfair to impose modalities of proof that are specific to such nonexistent personal relationships to insulate defendants from classwide liability to those with whom they related on a classwide basis.").

## E.     THE DISTRICT COURT'S RESOLUTION OF REYES' LEGAL THEORY

The District Court acknowledged the "complete sham" theory, explaining that in order for Reyes to succeed on this theory under Rule 23, he must demonstrate that the "defendant's conduct is so wrought with fraud as to be a complete sham[.]"  *Reyes*, 2013 WL 5332107, at *6.  Thus, the District Court realized that, in an appropriate case, "the class members' participation or involvement with the defendant is sufficient evidence that each class member suffered damages, rendering an analysis of individual transactions unnecessary."  *Id.*  As the District Court also recognized, pursuant to the "complete sham" theory,

15

misrepresentations by the defendant resulting in the plaintiffs experiencing common damages can prove common injury in a RICO class action. *Id.* (citing *Cullen*, 188 F.R.D. at 235).[12] In fact, the District Court even went so far (with some justification) as to compare this to the "fraud on the market" theory. *Id.* (citing *Lester v. Percudani*, 217 F.R.D. 345, 352 (M.D. Pa. 2003).[13]

However, the District Court concluded that class treatment was inappropriate here because Zions Bank and Modern Payments collaborated with separate mass-marketing firms and did so in different ways. The District Court

---

[12] As discussed further below, the Supreme Court has held that predominance requires that plaintiffs show that their individual injuries are capable of proof at trial through common evidence and that their damages are measurable on a classwide basis. *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1430, 1432-33 (2013); *but see In re Nexium Antitrust Litig.*, 777 F.3d 9, 21 (1st Cir. 2015) ("But it is well-established that the individuation of damages in consumer class actions is rarely determinative under Rule 23(b)(3). Where common questions predominate regarding liability, then courts generally find the predominance requirement to be satisfied even if individual damages issues remain." (internal quotation marks, alterations, and citation omitted)).

> [13] The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. . . . Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements. . . . The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.

*Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988) (internal quotation marks omitted).

stressed that "Reyes almost completely relies on the high return rates as his proof of the complete sham, [but] the returns are different for each telemarketer, [therefore] he cannot prove this complete sham theory on evidence common to the class since members of the class interacted with different telemarketers." *Id.* at *8. The District Court also emphasized that, although the high return rates were common to the telemarketers, they are insufficient to prove fraud.

With this background as our analytical compass, we will now discuss class certification within the context of Reyes' claim that he produced sufficient evidence of a sham enterprise to satisfy the requirements for class certification under Rule 23(b)(3).

## II. DISCUSSION

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2550 (2011) (quotation marks omitted).

Federal Rule of Civil Procedure 23 sets out requirements for bringing a class action. All potential classes must initially satisfy four prerequisites to be certified: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation. Fed. R. Civ. P. 23(a). Additional requirements must then be satisfied depending on whether a plaintiff seeks certification under Rule 23(b)(1), (2), or (3). *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 590 (3d Cir. 2012). Reyes is attempting to proceed under Rule 23(b)(3). Accordingly, he must satisfy the additional requirements of predominance and superiority.[14] Fed. R. Civ. P. 23(b)(3).

---

[14] When an action proceeds as a class action under Rule 23(b)(3), "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The District Court did not reach all of the prerequisites of Rule 23(a) or the superiority requirement in Rule 23(b)(3) because it concluded that Reyes had not established commonality as required under Rule 23(a) or predominance under Rule 23(b)(3).

"Commonality" is a consideration of whether there are "questions of law or fact common to the class[.]" Fed. R. Civ. P. 23(a)(2). Commonality is satisfied when there are classwide answers. *Wal-Mart Stores, Inc.*, 131 S. Ct. at 2551-52; *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 298-300 (3d Cir. 2011) (en banc) (considering "whether the defendant's conduct was common as to all of the class members[]" and common questions led to common answers such that the "alleged misconduct and the harm it caused would be common as to all of the class members[]").

The predominance inquiry then focuses on whether "the questions of law or fact common to class members predominate over any questions affecting only individual members[.]" Fed. R. Civ. P. 23(b)(3). "Predominance tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation[.]" *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 310-11 (3d Cir. 2008) (quotation marks omitted). Though related, this standard is "'far more demanding' than the commonality requirement of Rule 23(a)," *id.* (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997)), and requires "more than a common claim." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 187 (3d Cir. 2001).

Reyes seeks to represent a class that may include tens of thousands of claimants with potential civil RICO claims arising from the defendants' operation of a sham enterprise. "Establishing liability under [§ 1962(c)] of the RICO statute requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity, plus an injury to business or property." *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 269 (3d Cir. 2009) (internal quotation marks and citations omitted).

Reyes must show that the racketeering activity was the "but for" cause as well as the proximate cause of the injury

purportedly suffered by the members of the proposed class. *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 268 (1992). Proximate cause requires "some direct relation between the injury asserted and the injurious conduct alleged." *Id.*

Accordingly, we must determine if Reyes produced sufficient evidence to show that he could prove his RICO claim based on facts or evidence common to the class, and whether such proof predominates over facts and circumstances that are particular to given individuals within the proposed class.

The District Court concluded that Reyes established neither but-for cause, nor proximate cause because "Reyes would not be able to establish there was an impact that affected each class member in the same way." *Reyes*, 2013 WL 5332107, at *8. In reaching that conclusion, the District Court focused on the fact that potential class "[m]embers were contacted by telemarketers through different mediums about different products, and some, according to Reyes, were not contacted at all because the telemarketers bought their account information from other telemarketers." *Id.*

We must determine whether the District Court (1) applied the proper standard for assessing predominance and commonality, (2) appropriately reviewed Reyes' experts' opinions and the other evidence on the record, and (3) properly determined that commonality and predominance were not established based on the evidence presented. Much of our inquiry is guided by our analysis in *In re Hydrogen Peroxide Antitrust Litigation*.

## A.    STANDARD OF REVIEW

In reviewing a denial of class certification, we subject the District Court's legal rulings to *de novo* review. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 312; *see also In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24, 32 (2d Cir. 2006).

We review the District Court's findings of fact, its application of law to facts, and its decision regarding class

19

certification for an abuse of discretion. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 312, 320 (citations omitted). "The district court abused its discretion if its decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." *Newton*, 259 F.3d at 165-66 (footnote and quotation marks omitted). "To illustrate . . . using the example of numerosity, review of the factual finding as to the size of the proposed class would be for clear error, review of the judge's articulation of the legal standard governing numerosity would be *de novo*, and review of the ultimate ruling that applied the correct legal standard to the facts as found would be for abuse of discretion." *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d at 41.

## B.    RULE 23 LEGAL STANDARDS

"Class certification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23 are met." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 309 (footnote and quotation marks omitted). In conducting its inquiry, a district court must rigorously assess "the available evidence and the method or methods by which plaintiffs propose to use the evidence to prove impact at trial." *Id.* at 312 (citations omitted); *see also Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013) ("[T]he court's duty [is] to take a 'close look' at whether common questions predominate over individual ones." (quoting *Amchem Products, Inc.*, 521 U.S. at 615). On appeal, we do not "speculate as to what the District Court must have intended [regarding a Rule 23 requirement]. We cannot just assume the District Court conducted the appropriate analysis under Rule 23. 'Rigorous analysis' requires more of the District Court than that[.]" *Neale v. Volvo Cars of N. Am., LLC*, --- F.3d ---, Civ. Action No. 14-1540, 2015 WL 4466919, at *15 (3d Cir. July 22, 2015).

We have also explained that the Rule 23 inquiry may require the district court to "delve" behind the pleadings. *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 316 (quotation marks omitted). This means that, at the certification stage, the district court "cannot be bashful. It must resolve all factual or legal disputes relevant to class

20

certification, even if they overlap with the merits—including disputes touching on elements of the cause of action." *Marcus*, 687 F.3d at 591 (quotation marks omitted).

Without this searching inquiry, a district court cannot determine if class certification is appropriate. Certification "calls for findings by the court, not merely a 'threshold showing' by a party, that each requirement of Rule 23 is met. Factual determinations supporting Rule 23 findings must be made by a preponderance of the evidence." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 307.

## 1. Reyes' Burden of Proof

The District Court imposed a burden of absolute proof on Reyes at the certification stage. Reyes now correctly argues that "the 'absolute proof of fraud' standard . . . exceeds this Court's holding that factual issues bearing on the class certification 'must be made by a preponderance of the evidence.'" Appellant Br. at 35 (quoting *In re Hydrogen Peroxide Antitrust Litig*., 552 F.3d at 320).

The District Court realized that "[t]o obtain class certification, a plaintiff must demonstrate the proposed class satisfies all four elements of Federal Rule of Civil Procedure 23(a), along with one of the three requirements under Rule 23(b)[,]" and that "the court's findings as to the Rule 23 requirements must be supported by factual determinations made by a preponderance of the evidence[.]" *Reyes*, 2013 WL 5332107, at *3 (citations omitted). However, the District Court's analysis suffered from the same malady that troubled us in *In re Hydrogen Peroxide Antitrust Litigation*. "[S]ome statements in [the District Court's] opinion depart from the standards we have articulated." 552 F.3d at 321. The District Court stated the correct standard but misunderstood the burden of proof placed on a plaintiff seeking class certification.

In concluding that there was insufficient commonality, the District Court relied on the fact that "Reyes's experts have [not] testified that the return rates are . . . absolute proof of fraud[.]" *Reyes*, 2013 WL 5332107, at *8. The District Court also believed that proof must be so persuasive that the

certifying court "cannot have any doubt as to whether the Rule 23 requirements are met." *Id.* at *7.

The fact that the District Court imposed a burden of absolute proof is illustrated by the following statement: "since Reyes's experts have testified that the return rates are only 'red flags' of fraud and not *absolute proof of fraud*, the factfinder would have to analyze each telemarketer separately to determine whether or not it is a complete sham." *Id.* at *8 (emphasis added). The District Court also stated that it "must assess how Reyes will use the evidence at trial to prove impact on a classwide basis, and the Court *cannot have any doubt* as to whether the Rule 23 requirements are met." *Id.* at *7 (emphasis added) (citation omitted).

*In re Hydrogen Peroxide Antitrust Litigation* requires that a district court "not suppress doubt as to whether a Rule 23 requirement is met[.]" 552 F.3d at 321 (internal quotation marks omitted). While a district court must consider how the evidence will be used at trial, *id.* at 311 & n.8, the plaintiff's burden is not proof beyond "any doubt" as the District Court required, but whether the claims are supported by a preponderance of the evidence. *Id.* at 320.

We agree with the District Court's conclusion that "it is possible that not every telemarketer named in the Amended Complaint is a complete sham." *Reyes*, 2013 WL 5332107, at *7. However, the standard is not whether it is mathematically or scientifically *possible* that one of these telemarketers is not a complete sham. Rather, Reyes must establish that it is more likely than not that each of the telemarketers and the defendants operated a complete sham as alleged. Reyes "must affirmatively demonstrate his compliance" with Rule 23, *Wal-Mart Stores, Inc.*, 131 S. Ct. at 2551, and "satisfy [the trial court] through evidentiary proof [of] at least one of the provisions of Rule 23(b)." *Comcast Corp.*, 133 S. Ct. at 1432; *see also Byrd v. Aaron's Inc.*, 784 F.3d 154, 163 (3d Cir. 2015). However, "the Rules and our case law have consistently made clear that plaintiffs need not actually establish the validity of claims at the certification stage." *Sullivan*, 667 F.3d at 306 (footnote omitted).

22

Here, as in *In re Hydrogen Peroxide Antitrust Litigation*, in remanding this matter to the District Court, we "recognize that the able District Court did not have the benefit of the standards we have articulated." 552 F.3d at 322. Nevertheless, it is now clear that the District Court must (1) conduct rigorous analysis, (2) review all avenues of inquiry in which it may have doubts (even if it requires reviewing the merits) in order to (3) be satisfied and (4) make a definitive determination on the requirements of Rule 23, or even (5) require that a plaintiff demonstrate actual, not presumed conformance with Rule 23 requirements. We stress, however, that the preponderance of the evidence standard governs. The perfection of proof that the District Court demanded here is simply not required. Moreover, it is important for the District Court to remember that an inability to calculate damages on a classwide basis will not, on its own, bar certification. *Neale*, 2015 WL 4466919, at *17 & n.10 (collecting cases). A district court errs when it holds a plaintiff seeking class certification to a higher standard of proof than proof by a preponderance of the evidence, and remand is thus appropriate. *See In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 322 ("To the extent that the District Court's analysis reflects application of incorrect standards, remand is appropriate.").

2. **Evidence of Commonality and Predominance**

It is often appropriate to discuss commonality and predominance together because the commonality inquiry is subsumed into the predominance inquiry. *See, e.g.*, *Danvers Motor Co. v. Ford Motor Co.*, 543 F.3d 141, 148 (3d Cir. 2008) ("[W]here an action is to proceed under Rule 23(b)(3), the commonality requirement is subsumed by the predominance requirement." (internal quotation marks omitted)). We have also concluded that "[r]eading the District Court's commonality and predominance analyses together . . . is appropriate in [the RICO] context[.]" *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d at 266-67 (citation omitted).

Therefore, we do not fault the District Court for combining its discussions of commonality and predominance. *Reyes*, 2013 WL 5332107, at *5-9. However, in the interest

of clarity, we will address each requirement separately. We will first discuss commonality, and then discuss predominance. *In re LifeUSA Holding, Inc.*, 242 F.3d 136, 145 (3d Cir. 2001) ("[C]ommon questions (commonality) must be established *before* predominance can be found . . . ." (emphasis added)); *see generally Marcus*, 687 F.3d at 597, 600-12.

### a.    Commonality

As explained above in relation to the different return rates, the District Court concluded that because Reyes' evidence "result[s] in individual inquiries as to each telemarketer," class certification is precluded. *Reyes*, 2013 WL 5332107, at *8. The focus of the District Court's inquiry was whether the proposed class would "generat[e] common *answers* apt to drive the resolution of the litigation, such that a determination of the truth or falsity of the contention will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at *4 (emphasis in original) (internal quotation marks omitted).

Federal Rule of Civil Procedure 23(a)(2) merely requires that there be "questions of law or fact common to the class[.]" Commonality does not require perfect identity of questions of law or fact among all class members. Rather, "even a single common question will do." *Wal-Mart Stores, Inc.*, 131 S. Ct. at 2556 (quotation marks and alterations omitted); *Baby Neal v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994) (discussing how Rule 23(a)(2) "is easily met[]"). "A putative class satisfies Rule 23(a)'s commonality requirement if the named plaintiffs share at least one question of fact or law with the grievances of the prospective class." *Rodriguez v. Nat'l City Bank*, 726 F.3d 372, 382 (3d Cir. 2013) (internal quotation marks omitted). A court's focus must be "on whether the defendant's conduct [is] common as to all of the class members[.]" *Sullivan*, 667 F.3d at 298. "Again, th[e] bar is not a high one." *Rodriguez*, 726 F.3d at 382.

When a party seeks to certify a class to bring a RICO claim, the focus is on the defendant's conduct. As we said in *In re Insurance Brokerage Antitrust Litigation*:

24

[p]roving the first element of a RICO violation in this case would involve common questions about the activities of the . . . *Defendants* and, in particular, whether the . . . *Defendants* participated or engaged in conduct with other . . . *Defendants*. The second element also involves common questions of law and fact, namely whether an enterprise of . . . *Defendants* existed . . . either as an association in fact or as a more formal organization or entity. Proving the third and fourth elements would encompass common questions of law and fact as well, including whether activities that constitute racketeering were taking place through the enterprise (such as mail or wire fraud) and whether these racketeering activities were recurring such that a pattern could be established.

579 F.3d at 269-70 (emphasis added). These elements focus on the defendants' joint conduct vis-à-vis the plaintiffs. Likewise, the District Court in this case noted that "the first four elements of a RICO claim . . . focus[] on the defendants' conduct and the effect of that conduct." *Reyes*, 2013 WL 5332107, at *5 (citation omitted). Thus, a properly supported RICO allegation will often contain common issues because, like "commonality[, a RICO allegation,] is informed by the defendant's conduct as to all class members and any resulting injuries common to all class members[.]" *Sullivan*, 667 F.3d at 297; *see also In re Ins. Brokerage Antitrust Litig.*, 579 F.3d at 269-70. "Whether the evidence presented proves a RICO conspiracy[]" is a question "common to each class member and will generate common answers[.]" *In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig.*, 2015 WL 4547042, at *13-14.

We also note that the elements of a RICO claim fit *Wal-Mart*'s commonality requirement because determining the "truth or falsity" of a "common contention[,]" here an element of RICO, "will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc.*, 131 S. Ct. at 2551; *see In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig.*, 2015 WL 4547042, at

25

*13 (distinguishing a putative RICO class action from the pitfalls of the class action rejected in *Wal-Mart*).

Reyes has presented evidence which, if accepted, could establish by a preponderance of the evidence that (1) "Zions and Modern Payments were processing transactions for a number of entities -- in addition to NHS Systems -- that government agencies [later] determined were fraudulent[,]" Appellant Br. at 15; Appellee Br. at 48-49, (2) Zions Bank, Netdeposit, and Modern Payments sent e-mails communicating a sense of shock regarding the "staggering" return rates, JA 686, and concerns that they may be at risk for some of their business lines being used for "money laundering[,]" *id.* at 692, (3) Zions Bank was aware that its high return rates "alarm[ed]" NACHA," *id.* at 814-15, and (4) Modern Payments was "afraid of" a probe by the FTC regarding potential fraud, *id.* at 693, and Zions Bank received warnings from other banks that they "will disput[e] all charges" generated by NHS Systems. *Id.* at 1061-62. On remand, the District Court should consider whether this evidence, if accepted as credible, is sufficient to conclude that there is "actual, not presumed, conformance" with Rule 23. *Marcus*, 687 F.3d at 591 (quotation marks omitted); *see also Wal-Mart Stores, Inc.*, 131 S. Ct. at 2551 (requiring "[a] party seeking class certification [to] affirmatively demonstrate" compliance with Rule 23).

We are not persuaded that the evidence here is similar to that which was deemed insufficient for class certification in *Wal-Mart*. *Wal-Mart* affirmed that commonality can be satisfied when there is "significant proof" that the defendant "operated under a general policy of discrimination." *Id.* at 2553-54 (quotation marks omitted).

In *Wal-Mart*, the defendant operated in a discretionary, and thus arguably individualized way toward the members of the proposed class. The record did not establish a national policy or any single individual or group of individuals responsible for the exercise of discretion.

Here, there are slight variations in the telemarketers' and defendants' conduct underlying the putative class members' claims. For example, some plaintiffs were offered

government grants, while others were offered healthcare discount cards, and still others had no direct involvement at all as their account information was purchased by a defendant. However, unlike *Wal-Mart*, we are not concerned with damages that result from the exercise of anyone's discretion.

Further, in *Wal-Mart*, the plaintiffs' statistical and anecdotal evidence failed to demonstrate a "common mode of exercising discretion that pervades the entire company[.]" *Id.* at 2554-55. Without that, commonality could not be established.

In stark contrast, the sham theory used here relies on a "common mode" of behavior and a "general policy" of fraud. *See In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig.*, 2015 WL 4547042, at *13 (distinguishing *Wal-Mart* and reasoning that "the Plaintiffs in this case have alleged that the class was subjected to the same kind of illegal conduct by the same entities, and that class members were harmed in the same way, albeit to potentially different extents[]").

Reyes alleges that the defendants operated together in a common, fraudulent scheme that was a complete sham masquerading as a legitimate business undertaking. When a plaintiff alleges that a defendant's disputed conduct is a complete sham, the relevant inquiry is whether there was an ongoing scheme to defraud or deceive, *Rosario*, 963 F.2d at 1017-19, and whether the defendant fails to meet the most basic standard of its purported commercial undertaking, *Cullen*, 188 F.R.D. at 235. If so, a common harm will be presumed from the mere fact that class members were all similarly injured by the sham. A court can then conclude that there are common issues and that those common issues will predominate over individual issues.[15]

When viewed at this macroscopic level, rather than the microscopic level that may be required when allegations implicate a defendant's exercise of discretion, it is clear that we are not faced with the individual circumstances that were

---

[15] Because the "complete sham" theory also applies to the predominance inquiry, it will be discussed further below.

27

fatal to certification in *Wal-Mart*. As said, it is for the District Court to determine in the first instance whether Reyes has presented evidence that demonstrates commonality.

**b.    Predominance**

Reyes also contends that the District Court erred in finding that class claims did not predominate over individual claims. He argues that the District Court mistakenly focused on the return rates instead of considering that evidence in context with all of the testimony of his three experts, the FTC proceedings,[16] and all other evidence that the defendants knew that they were operating a fraudulent enterprise.

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc.*, 521 U.S. at 623 (citation omitted). It is important to note that Reyes is alleging a kind of consumer fraud. "[T]he Supreme Court has observed that predominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 321-22 (quotation marks omitted). One relevant "guidepost[] that direct[s] the predominance inquiry[]" is "that commonality is informed by the defendant's conduct as to all class members and any resulting injuries common to all class members[.]" *Sullivan*, 667 F.3d at 297. "[*Wal-Mart v.*] *Dukes* actually bolsters [this] position, making clear that the focus is on whether the defendant's conduct was common as to all of the class members, not on whether each plaintiff has a 'colorable' claim." *Id.* at 299. Rule 23 does not require the absence of all variations in a defendant's conduct or the elimination of all individual circumstances. Rather, predominance is satisfied if common issues predominate. *In re Linerboard Antitrust Litig.*, 305 F.3d 145, 162 (3d Cir. 2002). "[T]he

---

[16] As noted *supra* note 8, the proceedings came after the defendants' involvement here. But, *if admissible*, it would be for the factfinder to determine if the record, taken as a whole, supports the conclusion (or an inference) that the defendants were aware of the facts underlying the proceedings, or the proceedings themselves.

focus of Rule 23(b)(3) is on the predominance of common *questions*[.]" *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1195 (2013) (emphasis in original). A district court "analyze[s] predominance in the context of Plaintiffs' actual claims." *Neale*, 2015 WL 4466919, at *14.

When Rule 23 is the mechanism to redress alleged RICO violations, predominance and commonality are satisfied if *each element* of the alleged RICO violation involves common questions of law and fact capable of proof by evidence common to the class. *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d at 269-70. This is true even if "establishing an injury is not as conducive to common proof[,]" so long as a court is "satisfied that the plaintiffs have presented a plausible theory for proving a class-wide injury as a result of the racketeering activities of the alleged enterprises at issue[.]" *Id.* at 270; *see also Neale*, 2015 WL 4466919, at *17 & n.10 (collecting cases regarding how an inability to calculate damages on a classwide basis will not, on its own, bar certification). "The question is not what valid claims can plaintiffs assert; rather, it is simply whether common issues of fact or law predominate." *Sullivan*, 667 F.3d at 305 (citation omitted); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 311-12.

The predominance inquiry seeks to resolve whether there are "reliable means of proving classwide injury[.]" *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 252-53 (D.C. Cir. 2013); *see also In re Nexium Antitrust Litig.*, 777 F.3d 9, 21 (1st Cir. 2015). This is often done with the assistance of experts.

The District Court relied on *Johnston v. HBO Film Management, Incorporated*, 265 F.3d 178, 190 (3d Cir. 2001), and *In re LifeUSA Holding, Incorporated*, 242 F.3d 136, 146 (3d Cir. 2001), to conclude that, because these "telemarketers . . . interacted with consumers in different ways (by telephone, internet, and slamming)," *Reyes*, 2013 WL 5332107, at *7, and because return rates are not absolute proof that the defendants are a complete sham, "the only way to determine if a class member was defrauded was to individually examine the interaction between the defendant

and each class member." *Id.* at *6. Neither case persuades us.

In *In re LifeUSA Holding, Incorporated*, the fraud involved a product that "was not sold according to standard, uniform, scripted sales presentations." 242 F.3d at 146. We concluded that simply focusing on whether all potential class members were misled by the same product was inappropriate. *Id.* We also stated that when "the record is uncompromising in revealing non-standardized and individualized sales 'pitches' presented by independent and different sales agents, all subject to varying defenses and differing state laws, . . . certification of individualized issues [is] inappropriate." *Id.* at 147; *cf. Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1255 (2d Cir. 2002) ("[M]aterial uniformity in the misrepresentations may be established without the use of a standardized sales script[, for example.]").

In *Johnston*, we again held that oral misrepresentation must be uniform in order to establish predominance under Rule 23(b)(3). *See* 265 F.3d at 190. Thus, "it has become well-settled that, as a general rule, an action based substantially on oral rather than written communications is inappropriate for treatment as a class action." *Id.* (internal citations omitted).

However, both of those cases involved legitimate businesses and Reyes relies upon that to distinguish the circumstances here, arguing instead that the defendants and telemarketers here were not legitimate business entities. *See In re Cmty. Bank of N. Va. Mortg. Lending Practices Litig.*, 2015 WL 4547042, at *19, *21 (affirming the District Court's finding that individual issues of reliance will not predominate when the plaintiffs "allege[] that [the defendant] performed absolutely no services to earn the . . . fees[]"). Rather, Reyes asserts that they all acted in concert to perpetrate fraud through a sham enterprise and that each of the defendants had to have known the real nature of that fraudulent enterprise. He also claims that any variations in the manner in which various individuals were defrauded is irrelevant and not sufficient to preclude common issues of law from predominating. The argument is based on his claim that the defendants "engaged in systematic fraud and operated solely

30

to debit victims' accounts[]" and "there is no evidence of any cohort of class members who were not victims." Appellant Br. at 64.

Likewise, in *Cullen*, plaintiffs claimed that, while the "defendants represented that they were providing a program that would prepare students for careers as ultrasound sonographers[,]" they "misrepresent[ed] the nature of the ultrasound program, and failed to provide the education represented." 188 F.R.D. at 228. Even though the institution was accredited, the program that the plaintiffs were enrolled in was not. That prevented the program's graduates from sitting for the relevant registration examination. *Id.* at 228-29. The plaintiffs contended that the "defendants' operation was a 'complete sham,' and did not provide even a minimal education." *Id.* at 228. *Cullen* held that the sham theory satisfied the predominance requirement and it certified a RICO class. *Cullen* explained: "plaintiffs' proof will be focused on the defendants' conduct; plaintiffs' case will revolve around evidence that the school did not meet the most basic standards of an educational program. It need not involve time consuming proof of individual causation or reliance." *Id.* at 235. Instead, at trial, "[i]f the plaintiffs can prove that [the defendant] was a complete sham, then a fact finder can infer from the evidence that anyone who paid tuition and attended the school suffered damage." *Id.*

*Cullen* relied on *Rosario*, which had similar facts and involved a similar fraudulent scheme. The trial evidence in *Rosario* established that the defendant failed to provide students with the skills, equipment, or environment to prepare for a cosmetology career for which the school was supposed to train students. *Rosario*, 963 F.2d at 1016-17. The Court of Appeals for the Seventh Circuit affirmed the District Court's certification of the class. It held that the operative question was whether the "schools operated pursuant to an ongoing scheme to defraud and deceive prospective students[,]" thus applying a "complete sham" theory. *Id.* at 1018. The defendants attempted to negate that approach by relying on evidence that some students were satisfied with their education and two students who graduated did become licensed and were working in the field. The Seventh Circuit refused to conclude that the defendant-institution was not a

complete sham merely because "some class members were satisfied with their teachers, and at least two class members graduated from [the defendant's] schools and passed the state licensing exam." *Id.* at 1017. Rather, the Court concluded that "[t]he fact that there is some factual variation among the class grievances will not defeat a class action." *Id.* at 1017-18 (citation omitted).

While the District Court here recognized Reyes' theory of a sham enterprise, it nevertheless concluded that the evidence Reyes offered in support of that theory was insufficient to satisfy predominance because different sales pitches were used and different products were pitched. However, if absolute conformity of conduct and harm were required for class certification, unscrupulous businesses could victimize consumers with impunity merely by tweaking the language in a telemarketing script or directing some (or all) of the telemarketers not to use a script at all but to simply orally convey a general theme designed to get access to personal information such as account numbers.

We do not believe that our discussion of predominance in our prior cases intended to either license such behavior by placing it beyond the reach of Rule 23 or to supply a roadmap that would guide the unscrupulous in designing fraudulent schemes that would be beyond the reach of Rule 23. Otherwise, although such subtle but irrelevant variations in the manner of defrauding members of the public would not insulate unscrupulous marketers from liability in individual suits, it would -- for all practical purposes -- insulate them from class actions. An interpretation of Rule 23 that places class actions beyond the reach of consumers who have been victimized by fraudulent schemers who are wise enough to adopt schemes with subtle (but meaningless) variations would invite the kind of consumer fraud that Reyes is alleging here.

Class actions are often the only practical check against the kind of widespread mass-marketing scheme alleged here. The individual claims arising from such conduct are usually too small to justify suit unless aggregated in a class action. This is particularly true when, as is often the case, the scheme targets unsophisticated consumers with little disposable income and without the means or wherewithal to seek

assistance of legal counsel.  As a practical matter, the average victim of such a scheme nearly always finds it far easier -- and much cheaper -- to reluctantly accept any loss and move on than to undertake the expense and inconvenience endemic in the protracted process of trying to recover a few dollars years later.

A class action "permit[s] the plaintiffs to pool claims which would be uneconomical to litigate individually.  . . . [M]ost of [such] plaintiffs would have no realistic day in court if a class action were not available." *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985).  "[C]onsumers have little interest in litigating their claims individually because of the small amount of money per plaintiff that is at stake." Cabraser, *supra*, at 822 (quotation marks omitted). Moreover, obtaining counsel to pursue such a claim is usually the height of impracticality -- even for those who can afford to do so.  "What rational lawyer would have signed on to represent the [party] in litigation for the possibility of fees stemming from a $30.22 claim?"  *AT&T Mobility LLC v. Concepcion*, 131 S. Ct. 1740, 1761 (2011) (Breyer, J., dissenting).

In such cases, the class action can "create[] greater access to judicial relief[.]" *Marcus*, 687 F.3d at 594.  "[I]t is[, in fact,] possible to think of consumer class actions as providing an indispensable mechanism for aggregating claims when the individual stake is low and the similarity of the challenged conduct is high."  Samuel Issacharoff, *Group Litig. of Consumer Claims: Lessons from the U.S. Experience*, 34 Tex. Int'l L.J. 135, 149 (1999).[17]  Thus, class actions have the practical effect of allowing plaintiffs who have suffered relatively *de minimis* loss to nevertheless function as private attorneys general and thereby deter fraud in the marketplace.

---

[17] *See* Fed. R. Civ. P. 23 advisory committee's note to the 1966 amendment ("[A] fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class.").

The "complete sham" theory, if supported by an appropriate record, can satisfy the predominance prong of Rule 23(b)(3) by focusing on the overarching material and defining aspects of a defendant's conduct. This allows a court to certify a class despite subtle (but meaningless) variations that may occur while perpetrating a fraudulent scheme. Thus, as Reyes contends "[u]ltimately, the question is the extent to which fraud can be shown to have been committed on the class by common evidence." Appellant Br. at 64. On remand, the District Court should consider the entire record to determine if it supports that contention.

Investigator Blake testified "each of the schemes at issue was a totally fraudulent mass-marketing fraud." Blake Decl., JA 1613, ¶ 15. She concluded that these were all "precisely the kind of fundamentally fraudulent schemes that, in [her] experience, have been routinely adjudicated on the basis of common evidence of fraud." *Id.*, JA 1627-28, ¶ 85. Professor Meyer reviewed the evidence and concluded that the proof of fraud was classwide. He identified four key features common to the way each telemarketer obtained bank account information and initiated debits from bank accounts. He concluded that although "these 'products and programs' appear to vary, all had [those] four common features essential to their use as props in the scheme of deception[.]" Meyer Decl., JA 1639-40 ¶ 19. The court-appointed receiver for NHS Systems, Geisser, testified that NHS Systems was "totally fraudulent and that no consumer who . . . had money taken from their account was not injured in the amount of money taken from their account[.]" Geisser Dep., JA 1161.

The District Court may consider that the defendants' experts offer little reason to conclude that predominance cannot be satisfied here. As noted above, Milner testified for the defendant. Milner did not agree that a return rate in excess of 10% was *prima facie* evidence of fraud. However, she also explained that pursuant to its Operating Rules, "NACHA gathers specific information concerning individual Originators with high rates of unauthorized returns . . . [and] may send the bank of an originator producing unauthorized returns in excess of 1% a written request for information

about specific originators." Milner Decl., JA 3787, ¶ 25 (citation and footnote omitted).

Professor Boss testified that "the overwhelming majority of banks in the United States have no unauthorized returns at all . . . ." Boss Decl., JA 590 ¶ 82. Reyes focuses our attention on testimony that Zions Bank, like most U.S. banks, had no unauthorized returns in August of 2006. It then started working with its wholly-owned subsidiary, Modern Payments, and its unauthorized returns began to "immediately . . . increase dramatically from *zero* in August 2006 to 799 in October, [and] 2,095 to 2,632 by February 2007." *Id.*, JA 587-88 ¶ 78 (emphasis in original). As noted earlier, when adjusted for its size, Zions Bank had the highest rate of returns of any U.S. bank.

Reyes also offers the following chart summarizing the evidence regarding the return rates of the telemarketers:

| | Total Return Rates | | | |
| --- | --- | --- | --- | --- |
| Fraud Scheme | Average Return Rate* | First Month Return Rate* | Total Months With Zions* | Return Rate as a Multiple of 2007 National Average (1.25%)** |
| **NHS** | 64.79% | 51.90% | 15 | 52 |
| **RX Smart** | 54.21% | 42.00% | 3 | 43 |
| **Market Power Entities** | | | | |
| Market Power | 86.73% | 85.10% | 11 | 69 |
| Payday loan | 73.46% | 70.98% | 4 | 59 |
| Get Your Credit Rept | 62.48% | 55.94% | 4 | 50 |
| Vexeldale | 74.09% | 70.52% | 4 | 59 |
| **Platinum Benefit Group** | 30.83% | 37.98% | 39 | 25 |
| **Group 1 Entities** | 51.67% | 65.41% | 21 | 41 |
| **Low Pay Inc** | 68.83% | 65.41% | 10 | 55 |

\* JA 661          \*\* JA 663

Appellant Br. at 25 (footnote omitted).[18]

-----

[18] We are not, of course, suggesting that the District Court had to accept the conclusions in the chart or the expert testimony that the scheme here is susceptible to class treatment. That determination remains left to the sound discretion of the District Court. However, the District Court

The crux of the Rule 23(b)(3) predominance inquiry here is whether a preponderance of the evidence supports Reyes' proposition that the defendants operated a complete sham, and whether an affirmative answer to that inquiry would establish the required element of predominance. Reyes claims that if the evidence supports such a finding by a preponderance of the evidence, the predominance requirement of Rule 23(b)(3) is satisfied, even though the telemarketers did not read from a uniform script or use the same method of defrauding each of the members of the putative class. Appellant Br. at 62-63 (distinguishing this case from *In re LifeUSA Holding, Incorporated* and *Johnston* because there is a "question about the legitimacy of the [entity] itself[]" in which Reyes alleges the existence of one "systematic fraud").

As we have reiterated, Reyes argues the District Court erred in relying only on high return rates to deny class certification. As detailed above, Reyes also introduced proof of the structure of each of the schemes and FTC investigations. In particular, Reyes points to "broader eviden[ce] . . . includ[ing] three experts (all of whom opined that the underlying mass-marketing schemes were completely fraudulent), the related government proceedings, Mr. Geisser's testimony, and a wealth of documentary evidence and deposition testimony reflecting Defendants' knowledge of the fraud they were furthering." *Id.* at 54.[19] According to

is not free to simply ignore such testimony without explaining why it is rejecting it. That is the antithesis of the thorough and rigorous inquiry that the law demands at the certification stage.

[19] *See also* Appellant Reply Br. at 9-12 (discussing additional evidence, including "internal bank documents showing that Defendants were aware that they were providing services to frauds," warnings from regulators, other banks, and employees "directly inform[ing] [the defendants] that they were carrying out transactions for frauds[,]" expert testimony, testimony from Geisser, "documents and declarations from both regulatory actions that identified each of the mass-marketing entities as frauds and those that

36

Reyes, the "evidence [presented about the fraudulent companies] applies to the class as a whole, [therefore] the jury's consideration of th[e] evidence would apply to each class member's claim." *Id.* at 37. If accepted, the District Court may conclude that this evidence supports a finding that there was a single fraudulent RICO enterprise, that each defendant participated in that enterprise, and that all members of the proposed class were damaged in the amount of the funds debited from their bank accounts pursuant to the fraudulent scheme. We leave it for the District Court to assess this on remand.

Reyes further asserts that the District Court could have specified subclasses for each defendant if it were concerned about proving fraud with respect to each entity. *Id.*; Appellant Reply Br. at 6 n.4. On remand, to the extent that

---

ordered complete restitution of their victims[,]" data demonstrating the "explo[sion]" of unauthorized returns following the formation of the alleged RICO enterprise, and "documents showing that Defendants closely monitored the entities' extreme return rates—which they openly acknowledged were staggering[.]" (citations and quotation marks omitted)).

In mentioning this evidence, we in no way suggest that we agree with the District Court's conclusion that evidence of high return rates cannot establish fraud on this record. We refrain from concluding that return rates can never be *prima facie* evidence of fraud or knowledge of fraud, no matter how much they vary from industry norms. *See* Blake Decl., JA 1612-13 ¶ 14.d ("The schemes at issue here involve unusually high numbers of returns even compared to other fraudulent schemes I have investigated. It is therefore highly likely that most of these schemes engaged in what is commonly known as 'slamming.'"); Boss Decl., JA 587-88, 590 ¶¶ 78, 82 ("Anyone in possession of the[] facts [about the return rates] would have to have known fraud was involved. . . . It is obvious that the high rates of unauthorized returns are indicative of fraudulent activity by these companies."); Meyer Decl., JA 1637-38 ¶¶ 12.a, 14 ("For there to be such high return rates there had to be fraud involved. . . . I conclude with reasonable certainty that the return rates alone establish that each of the entities at issue was fraudulent.").

the District Court is concerned with the commonality and predominance requirements because of variations in the way the affairs of the allegedly fraudulent enterprise was conducted, it can consider whether Reyes' proposed subclasses would adequately address those concerns. Fed. R. Civ. P. 23(c)(5), (d); *see also Neale*, 2015 WL 4466919, at *15 ("[T]he District Court should evaluate the relevant claims (grouping them where logical and appropriate) and rule on the predominance [and commonality] question[s] in light of the claims asserted and the available evidence." (citation omitted)); Tobias Barrington Wolff, *Discretion in Class Certification*, 162 U. Pa. L. Rev. 1897, 1898 (2014) ("[D]istrict courts sometimes exercise discretion in defining the parameters of the class definition and deciding when subclasses are necessary, often acting independently of any proposals made by the parties." (footnote omitted)).[20] We note, however, "[t]he court has no *sua sponte* obligation so to act." *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388, 408 (1980). "[I]t is not the District Court that is to bear the burden of constructing subclasses. That burden is upon the [plaintiff] . . . who is required to submit proposals to the court." *Id.*

As we have already explained, Reyes is correct in asserting that the District Court erred when it "examined one piece of evidence -- the mass-marketers' extreme return rates -- and concluded that these rates alone were not 'absolute proof' of fraud." Appellant Br. at 37. The law does not permit a district court to only consider and analyze the "most significant evidence[.]" *Reyes*, 2013 WL 5332107, at *2. Rather, the trial court must consider "*all* relevant evidence and arguments, including relevant expert testimony of the parties [unless there is a reason to reject certain testimony]." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 325 (emphasis added); *see also In re Blood Reagents Antitrust Litig.*, 783 F.3d 183, 187 (3d Cir. 2015). Moreover, as we have also explained, we do not require "absolute proof." Indeed, such a burden would be prohibitive, as few things are capable of *absolute* proof that removes all possibility of

---

[20] For a very thorough development of the evolution of discretion under Rule 23, *see* Wolff, *Discretion in Class Certification*, 162 U. Pa. L. Rev. at 1911-39.

doubt. Here, the District Court's analysis singled out the "most significant evidence" (return rates) and then improperly applied a heightened standard to that evidence while ignoring all of the other testimony.

However, there is an even more fundamental flaw in the District Court's analysis. The District Court relied on fact witnesses while ignoring expert testimony, and confused the testimony of the witnesses it did consider.[21] As noted above, Reyes presented declarations from three expert witnesses: Professors Boss and Meyer, and Investigator Blake. However, the District Court failed to mention, let alone closely scrutinize, any of Reyes' experts. *See Amchem Products, Inc.*, 521 U.S. at 615-16 (referring to the trial court's "close look" before finding predominance and superiority); *In re Hydrogen Peroxide Antitrust Litig.*, 553 F.3d at 320 ("[A] district court errs as a matter of law when it fails to resolve a genuine legal or factual dispute relevant to determining the requirements."). The District Court then referred to Geisser and Fox as Reyes' expert witnesses. *Reyes*, 2013 WL 5332107, at *7. Geisser and Fox were not expert witnesses, but fact witnesses. Geisser was installed as the NHS Systems receiver after the FTC obtained a preliminary injunction against NHS Systems; Fox was a senior director of risk investigation at NACHA. Appellant Br. at 10, 12, 26.

Perhaps because it confused their role and expertise, the District Court relied on a concession by the fact witnesses to justify limiting its analysis to evidence of high return rates. *Reyes*, 2013 WL 5332107, at *7 (relying on Geisser's concession and Fox's silence to conclude that the high return rates are not dispositive of fraud). However, not only did Reyes' expert witnesses fail to make this concession, Blake Decl., JA 1612-13 ¶ 14.d; Boss Decl., JA 587-88, 590 ¶¶ 78, 82; Meyer Decl., JA 1637-38 ¶¶ 12.a, 14, they also based their conclusions on the additional evidence discussed above.

---

[21] Much of the confusion here is understandable. The District Court inherited the rather voluminous record in this case from another judge.

The defendants correctly remind us that "[d]istrict courts are *not* required under *Hydrogen Peroxide*, or any other authority, to cite specifically to the declarations of every expert or every other piece of evidence relevant to class certification merely to prove that they were considered in its rigorous analysis of the Rule 23 requirements." Appellee Br. at 32-33 (emphasis in original) (citations omitted). That is undoubtedly true. However, a "rigorous analysis" is nevertheless mandated, and the defendants do not contest that.

Quite obviously, an analysis of testimony that refers to individuals as expert witnesses when they are merely fact witnesses and confuses one party's fact witnesses with experts, while not correctly citing any expert testimony, is inconsistent with the demanding scrutiny required under Rule 23. "[T]he court's obligation to consider all relevant evidence and arguments *extends to expert testimony*, whether offered by a party seeking class certification or by a party opposing it." *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d at 307 (emphasis added).

We have not required a district court to refer to, or cite, every expert that either party presents and we do not do so now.[22] Rather, we merely apply the holding of *In re Hydrogen Peroxide Antitrust Litigation*: "[T]he district court must make whatever factual and legal inquiries are necessary and *must consider all relevant evidence and arguments* presented by the parties." 552 F.3d at 307 (emphasis added) (citation omitted).[23]

The defendants argue that the District Court's mistaken reference to fact witnesses as Reyes' experts did not

---

[22] *See, e.g.*, *Marcus*, 687 F.3d at 603 (failing to interpret *In re Hydrogen Peroxide Antitrust Litigation* as requiring a district court to explicitly discuss every expert opinion).

[23] As we have explained above, *In re Hydrogen Peroxide Antitrust Litigation* merely "emphasize[s] the need for a careful, fact-based approach, informed, if necessary, by discovery." 552 F.3d at 326.

result in an abuse of discretion because the District Court addressed the key arguments that each of Reyes' experts made. This record belies that argument. The District Court merely focused on high return rates, without more. *Reyes*, 2013 WL 5332107, at *7-8. Not only did the District Court minimize the probative value of that evidence by requiring *absolute* proof of fraud, thereby undermining its relevance to the requirements of Rule 23(a) and Rule 23(b)(3), it also failed to confront Reyes' experts' arguments on the importance of the return rates. *See, e.g.*, Boss Decl., JA 582-92 ¶¶ 66-87; Meyer Decl., JA 1637-38 ¶ 12.b. Further, as discussed above, the District Court failed to confront Reyes' experts' arguments of "clear indications of fraud[]" based on *more* than return rates. Boss Decl., JA 587 ¶ 77. *See, e.g.*, Blake Decl., JA 1613 ¶ 15; Boss Decl., JA 592 ¶ 87; Meyer Decl., JA 1639 ¶ 18.[24]

A district court errs as a matter of law when it confuses testimony, as the District Court did here, and fails to carefully scrutinize the relevant, disputed testimony.[25]

## III.   CONCLUSION

For the reasons set forth above, we will vacate the order denying class certification and remand for proceedings consistent with this opinion.

---

[24] Amici remind us that Milner testified that "transactions may be returned to a merchant under 68 different return codes, each of which has a different definition and covers different return scenarios. None of these codes are defined to identity fraud." American Bankers Ass'n & Indep. Cmty. Bankers of America Br. at 5. That does not negate the force of the evidence of rate of return of each of the defendant merchants here. It is fair to assume that similarly situated banks would generally have roughly equivalent return rates. Indeed the testimony here supports that assumption.

[25] We may have a different situation if the District Court quoted the expert witnesses, but mistakenly referred to them as fact witnesses. That is not what happened. Here, we have the fact witnesses' arguments and names, not the experts'.